# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROGER JUDGE : CIVIL ACTION
:
   vs. :
: NO. 02-CV-6798
JEFFREY BEARD, Commissioner, :
Pennsylvania Department of :
Corrections, WILLIAM STICKMAN,:
Superintendent of the State :
Correctional Institution at :
Greene, ROBERT W. MEYERS, :
Superintendent of the State :
Correctional Institution at :
Rockview, and MICHAEL FISHER, :
Attorney General of the :
Commonwealth of Pennsylvania :

## MEMORANDUM AND ORDER

**JOYNER, J.** **November 28, 2012**

Presently before the Court for decision is the Petition for Writ of Habeas Corpus first filed by the petitioner, Roger Judge, on August 16, 2002, and amended on April 16, 2004. Previously, on March 13, 2009, we granted Petitioner's Motion for Partial Summary Judgment on Claim V of the Petition seeking relief from the sentence of death on the basis of the Supreme Court's decision in <u>Mills v. Maryland</u>, 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988).[1] For the reasons that follow, the

---

[1] Specifically, we found that the instructions given to the jury at the sentencing phase of Mr. Judge's trial erroneously led the jurors to believe that they were required to *unanimously* find the existence of *both* mitigating and aggravating circumstances in determining whether he should be sentenced to death or to life imprisonment.

remainder of the petition is now granted in part and denied in part.

## Factual and Procedural Background

This case arose on the night of Friday, September 14, 1984, at approximately 11:49 p.m. when a group of teenagers consisting of Christopher Outterbridge, his sister Lisa, her friend Tanya Mitchell and Tanya's younger sister Tabatha, and two other friends, Cathy Green and Calvin Whitaker, were returning to the Outterbridge home at 1108 West Wyoming Avenue in Philadelphia from a nearby sandwich shop. The group had just reached the porch of the Outterbridge home where Christopher and Lisa's younger sister, Kia Outterbridge, was waiting, when Petitioner walked up and began firing a .32 caliber revolver at the porch. In the process, the revolver was emptied of all five of its shots and 18-year-old Christopher Outterbridge and 15-year-old Tabatha Mitchell were fatally wounded.

A nearby police patrol car responded almost immediately to the scene after the shooting, but the shooter had fled the scene. Unfortunately for Petitioner, all of the surviving teenagers recognized and identified him as a resident of the neighborhood with whom they were familiar, albeit by his street name, "Dobe."[2]

_____

[2] Although he was obviously mortally injured, Christopher Outterbridge also identified the person who shot him as "Dobe," both to the police officers who first responded to the scene and to the officer who drove him to the Northern Division of Albert Einstein Hospital, where he died approximately one hour later. Although she died a short while after Christopher, it appears from the record that Tabatha was unresponsive after she was shot in the chest.

While there were some minor discrepancies, all of the witnesses described "Dobe" as being short, between 5'2" and 5'6" tall, with a short, box haircut and wearing an orange- or red-colored hooded rain jacket at the time of the shooting. Several of the witnesses identified Petitioner as being "Dobe" from a photo lineup and a warrant was issued for his arrest in the early morning hours of September 15, 1984. After eluding the police for almost two weeks, Petitioner was eventually apprehended on October 2, 1984. He was subsequently tried and convicted of two counts of first degree murder and one count of possession of an instrument of crime following a week-long jury trial on April 15, 1987, and sentenced to death.

On June 12, 1987, following the summary denial of post-trial motions, Petitioner was formally sentenced by the trial judge, the Honorable Albert F. Sabo of the Philadelphia County Court of Common Pleas. Two days later, however, Petitioner escaped from the Holmesburg Prison in Philadelphia and fled to Vancouver, Canada where, on July 13, 1988, he was convicted of two robberies and sentenced to ten years' imprisonment. His Canadian convictions were upheld on appeal.[3]

On August 11, 1987, while Petitioner was a fugitive, his convictions and death sentences were certified for automatic

---

[3] See, Regina v. Judge, No. CA009747, Court of Appeal for British Columbia, March 1, 1991; Commonwealth v. Judge, 591 Pa. 126, 130, 916 A.2d 511, 513 (2007).

appeal to the Pennsylvania Supreme Court.  Acting *sua sponte* on
December 22, 1989, the Pennsylvania Supreme Court issued a *per
curiam* order that limited its review to the sufficiency of the
evidence and the propriety of the sentence "as required by
Commonwealth v. Zettlemoyer, 500 Pa. 16, 454 A.2d 937 (1982),
*cert. denied*, 461 U.S. 970, 103 S. Ct. 2444, 77 L. Ed. 2d 1327,
*reh'g denied*, 463 U.S. 1236, 104 S. Ct. 31, 77 L. Ed. 2d 1452."
See, Commonwealth v. Judge, 530 Pa. 403, 405, 609 A. 2d 785, 786,
n.4 (1992).  In spite of this limitation, Petitioner's attorney
raised several claims of trial error for review.  While
acknowledging that it had "the authority to correct errors at
trial which the appellant raises," the Supreme Court noted that
its "rules expressly provide for the quashing of an appeal when
the appellant is a fugitive..., and it is within the discretion
of this Court to take such action *sua sponte* ... Additionally,
this Court has held that 'a defendant who elects to escape from
custody *forfeits* his right to appellate review.'"  Judge, 609
A.2d at 786, (citing Pa. R. A. P. 1972(6), Commonwealth v.
Passaro, 504 Pa. 611, 616, 476 A.2d 346, 349 (1984), and
Commonwealth v. Tomlinson, 467 Pa. 22, 354 A.2d 254 (1976)).  The
Court went on to review the case record and found that the
evidence produced was sufficient beyond a reasonable doubt to
support the first degree murder convictions and that the
sentences of death imposed were neither excessive nor

disproportionate to the penalty imposed in similar cases. It therefore affirmed the petitioner's convictions and death sentence. <u>Judge</u>, 609 A.2d at 790-91.

On June 15, 1993, Petitioner was ordered deported from Canada but the deportation order was made conditional because Petitioner had announced his intention to claim refugee status. Thereafter, he withdrew this claim and the deportation order became effective on June 8, 1994. However, on January 26, 1995, on recommendation of the Correctional Services of Canada, Mr. Judge's case was reviewed by the National Parole Board, which ordered that he be detained in Canada to serve out the balance of his sentence or until August 8, 1998.

On November 10, 1997, Petitioner wrote to the Canadian Minister of Citizenship and Immigration requesting ministerial intervention to stay the deportation order against him until such time as the United States sought to extradite him. Apparently, Petitioner was aware that if the United States sought to extradite him, Canada could ask for assurances from the United States that he would not be executed.[4] Via letter dated February 18, 1998, however, the Canadian Minister refused this request. Petitioner then applied to the Federal Court of Canada for leave to commence an application for judicial review of the Minister's

---

[4]   Contrary to the opinions written in this matter by the Pennsylvania Supreme Court, the United States never sought to extradite Petitioner from Canada.  <u>See</u>, <u>e.g.</u>, <u>Commonwealth v. Judge</u>, 591 Pa. 126, 130, 916 A.2d 511, 513 (2007); <u>Commonwealth v. Judge</u>, 568 Pa. 377, 384, 797 A.2d 250, 255 (1992).

refusal and for a stay of the deportation order and a declaration
that his detention in Canada and deportation to the United States
violated his rights under the Canadian Charter.  This application
was summarily denied on June 23, 1998, and Mr. Judge then
petitioned the Superior Court of Quebec, which had concurrent
jurisdiction with the Canadian Federal Court, for identical
relief.  That Court, on August 6, 1998, declined to exercise
jurisdiction because proceedings had already been undertaken in
the Federal Court.  The following day, Petitioner filed a
complaint with the Human Rights Committee of the United Nations
claiming that Canada violated Articles 6, 7, 10, and 14 of the
International Covenant on Civil and Political Rights (ICCPR) by
deporting him to face a sentence of death in Pennsylvania.  On
August 9, 1998, Canada deported Petitioner to New York, and
Pennsylvania thereafter had him extradited back to the
Commonwealth.  Eventually, the United Nations' Human Relations
Committee determined, via published decision dated August 13,
2003, that Canada had violated Articles 2 and 6 of the ICCPR by
deporting the petitioner from Canada to the United States where
he faced the death penalty without receipt of assurances from the
United States that the death penalty would not be carried out and
by failing to afford him the opportunity to appeal the
deportation decision prior to his having been removed from
Canada.  <u>Judge v. Canada</u>, U.N. Human Rights Committee 78th

session, ICCPR/C/78/D/829/1998 (Aug. 13, 2003).

While still confined in Canada, on January 14, 1997, Petitioner had also filed a *pro se* petition in the Philadelphia County Court of Common Pleas under Pennsylvania's Post Conviction Relief Act, 42 Pa. C. S. §9542, *et. seq.* The petition was subsequently amended on February 16, 1999, after counsel was appointed to represent him. The Court of Common Pleas dismissed the petition without a hearing on July 27, 1999, reasoning that Petitioner's fugitive status resulted in a forfeiture of his post-conviction rights. That decision was subsequently affirmed by the Pennsylvania Supreme Court on May 23, 2002. <u>See</u>, <u>Commonwealth v. Judge</u>, 568 Pa. 377, 797 A.2d 250 (2002).

On August 16, 2002, Petitioner filed a Petition for Writ of Habeas Corpus in this Court, along with a second petition under the PCRA seeking relief under the U.S. Supreme Court's decision in <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002), which held that the United States Constitution places significant restrictions on a state's power to execute a mentally retarded offender.[5] In addition, on October 10, 2003, he filed yet another petition in

_____

[5] Given the Pennsylvania Supreme Court's determination that mental retardation was to be determined on the basis of the standards of either the American Association of Mental Retardation or the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM IV), which Petitioner conceded he could not satisfy, he withdrew his claims for relief under the second PCRA petition. <u>See</u>, <u>Commonwealth v. Judge</u>, 591 Pa. 126, 137, n. 9, 916 A.2d 511, 517, n. 9 (2007) (citing Petitioner's Brief at 11-12). In so far as Mr. Judge also raised an <u>Atkins</u> claim in the *habeas* petition now before us, we likewise deem that claim to have been waived and disregard it as it is unexhausted. <u>See generally</u>, <u>Rose v. Lundy</u>, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982).

the state courts captioned: *Petition for Statutory Habeas Corpus Relief and Habeas Corpus Relief under Article I, Section 14 of the Pennsylvania Constitution and/or for Statutory Post-Conviction Relief Under the Post Conviction Relief Act* in reliance upon the findings of the U.N. Human Rights Committee that Canada had violated the ICCPR in deporting him to the United States.  This Court then stayed the instant habeas proceedings to enable Petitioner the opportunity to exhaust these claims in the Pennsylvania courts.  In an Opinion dated May 12, 2005, the Philadelphia County Court of Common Pleas determined that, because the identical claim had been raised in Petitioner's federal *Habeas Corpus* petition, it need not address the claim, and it therefore dismissed the PCRA application.  Although it did consider the violation of international law argument, the Pennsylvania Supreme Court nevertheless affirmed the dismissal of Petitioner's third PCRA application on the ground that there was nothing in the ICCPR itself or in the decisions of the Human Rights Committee which compelled the Pennsylvania state courts to enforce the international treaties involved.  <u>Commonwealth v. Judge</u>, 591 Pa. 126, 916 A.2d 511 (2007).  On November 7, 2007, the United States Supreme Court denied Petitioner's application for writ of *certiorari*.  <u>Judge v. Pennsylvania</u>, ___ U.S. ___, 128 S. Ct. 533, 169 L. Ed. 2d 374 (2007).

It appearing to this Court that Petitioner had then

exhausted his available state remedies, we lifted the stay of proceedings in this matter on December 12, 2007. On July 29, 2008, Petitioner filed his motion for partial summary judgment, which we granted in our Memorandum and Order of March 13, 2009.

## **Discussion**

As previously noted in our Memorandum Opinion of March 13, 2009, the Commonwealth asserts that this Court is foreclosed from considering *any* of Petitioner's habeas claims as a consequence of his having escaped from custody and by operation of the bar imposed by Pennsylvania's fugitive forfeiture rule. Because we determined in that Opinion that the fugitive forfeiture rule is an inadequate bar, we are compelled to now evaluate the merits of Petitioner's remaining claims.[6]

---

[6] Since that time, the U.S. Supreme Court has vacated and remanded the decisions of the U.S. Court of Appeals for the Third Circuit in both Kindler v. Horn, 542 F.3d 70 (3d Cir. 2008) and Abu-Jamal v. Horn, 520 F. 3d 272 (3d Cir. 2008), two of the decisions on which we relied in our March 13, 2009 Memorandum. In Kindler, the Supreme Court found that a state procedural rule was not automatically deemed inadequate merely because it was discretionary and it remanded that case to the Third Circuit for consideration of the limited question "whether the Pennsylvania courts applied a 'new rule mandating dismissal,' which 'constituted a break from past discretionary practice.'" The threshold question thus became whether Pennsylvania's fugitive forfeiture rule, as applied to Kindler's case, was "inadequate and therefore unenforceable on federal habeas review." See, Kindler v. Horn, 642 F.3d 398, 401, 404(3d Cir. 2011). Abu-Jamal was vacated and remanded to the Third Circuit for reconsideration of its finding that the jury instructions given during the sentencing proceeding were unconstitutional under Mills v. Maryland, 486 U.S. 367, 108 S. Ct. 1860. 100 L. Ed.2d 384 (1988)in light of the intervening decision in Smith v. Spisak, ___U.S.___, 130 S. Ct. 676, 175 L. Ed.2d 595 (2010). See, Beard v. Kindler, ___U.S.___, 130 S. Ct. 612, 175 L. Ed. 2d 417 (2009); Beard v. Abu-Jamal, ___U.S.___, 130 S. Ct. 1134, 175 L. Ed.2d 595 (2010). On remand, the Third Circuit has now re-affirmed its previous holdings that at the time of Joseph Kindler's escape from custody in September, 1984, the rigid, mandatory rule that a Pennsylvania prisoner's escape from custody required dismissal of post-verdict motions was inadequate because it was novel. Kindler v. Horn, 642 F.3d at 404. And, after carefully examining the jury instructions given in Spisak with those given in Mills and

### A.  Standards Governing Habeas Petitions Under §2254

It is axiomatic that "[t]he writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law."  Harrington v. Richter, ___ U.S. ___, 131 S. Ct. 770, 780, 178 L. Ed. 2d 624, 634 (2011).  Petitions for issuance of a Writ of Habeas Corpus filed by prisoners in custody as the result of a judgment of a state court are generally governed by 28 U.S.C. §2254.  Specifically, that statute states, in relevant part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
>
> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that -
>
> > (A) the applicant has exhausted the remedies available in the courts of the State; or
> >
> > (B)(i) there is an absence of available State corrective process or

---

in Abu-Jamal's case, the Third Circuit re-iterated its earlier conclusion that the verdict form together with the jury instructions read at Abu-Jamal's sentencing proceeding indicated that unanimity was required in the consideration of mitigating circumstances as well as aggravating circumstances and that "there is a substantial probability the jurors believed they were precluded from independent consideration of mitigating circumstances in violation of Mills."  Abu-Jamal v. Secretary, Pennsylvania Dep't. of Corrections, 643 F.3d 370, 377 (3d Cir. 2011), cert. denied, ___ S. Ct. ___, 2011 WL 3053650 (Oct. 11, 2011).  With the appeals in these cases having now been resolved and for the reasons articulated in our earlier opinion, we find this case to be on point with both and we see no need to re-visit our March 13, 2009 decision.  Accordingly, we proceed now to consider the remaining claims raised in Mr. Judge's petition.

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

. . . .

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that -

(A) the claim relies on -

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

. . . . . .

Thus, under AEDPA (the Anti-terrorism and Effective Death Penalty Act),[7] "federal courts are to review a state court's determinations on the merits only to ascertain whether the state court reached a decision that was 'contrary to' or involved an 'unreasonable application' of clearly established Supreme Court law, or if a decision was based on an 'unreasonable determination' of the facts in light of the evidence presented." Thomas v. Horn, Nos. 05-9006 and 05-9008, 2009 U.S. App. LEXIS 14285 at *8 (July 1, 2009) (citing Fahy v. Horn, 516 F.3d 169, 189 (3d Cir. 2008)).

"This is a 'difficult to meet,' and 'highly deferential standard for evaluating state-court rulings, which demands that state court decisions be given the benefit of the doubt.'" Cullen v. Pinholster, ___ U.S. ___, 131 S. Ct. 1388, 1398, 179 L. Ed.2d 557, 569 (2011). A legal principle is "clearly established" within the meaning of § 2254(d)(1) only when it is embodied in a holding of the Supreme Court. Thaler v. Haynes, ___ U.S. ___, 130 S. Ct. 1171, 1173, 175 L. Ed. 2d 1003, 1007 (2010).[8] A state

_____

[7] In 1996, Congress passed AEDPA, which implemented substantial changes into federal habeas corpus law. The focal point of the Act is 28 U.S.C. §2254(d), a provision that establishes a deferential standard that federal courts sitting in habeas are to afford state court decisions. Arman v. McKean, 549 F.3d 279, 287-88 (3d Cir. 2008) (citing Taylor v. Horn, 504 F.3d 416, 428-29 (3d Cir. 2007)).

[8] Until recently, there was significant confusion surrounding the point at which federal law becomes "clearly established" for purposes of §2254(d)(1) due to the competing discussions by Justices Stevens and O'Connor in Terry

court decision fails the 'contrary to' prong of AEDPA if the state court reaches a conclusion opposite to the Supreme Court's own conclusion on a question of law or decides the case differently where the Supreme Court was confronted by a set of materially indistinguishable facts." Harris v. Ricci, 607 F.3d 92, 96 (3d Cir. 2010) (quoting McMullen v. Tennis, 562 F.3d 231, 236 (3d Cir. 2009)). A state court decision is an "unreasonable application" of established federal law "if the state court

---

Williams v. Taylor, 529 U.S. 362, 390, 403-12, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). This confusion was finally eliminated last year in a case originating in the Third Circuit, Greene v. Fisher, No. 10-637, 2011 U.S. LEXIS 8077, 181 L. Ed. 2d 336 (Nov. 8, 2011). Specifically, in Greene, the Third Circuit rejected Justice Stevens's view that the applicable date for determining whether "Federal law" is "established" is the date the "state court conviction becomes final." Greene v. Palkovich, 606 F.3d 85 (3d Cir. 2010). The Third Circuit adopted the view of Justice O'Connor that the applicable date is "the time of the relevant state-court decision." See also, Smith v. Spisak, 558 U.S. 139, 130 S. Ct. 676, 681, 175 L. Ed. 2d 595, 600 (2010). Specifically, the Third Circuit stated,

> After surveying the questions that arise from the Supreme Court's Williams decision and considering the statutory text and post-Williams Supreme Court precedent, our view is that using the date of the relevant state-court decision to determine "clearly established Federal law" is the most logical approach to applying §2254(d)(1).

Greene, 606 F.3d at 95. In affirming, the Supreme Court noted that "the purpose of AEDPA is to ensure that federal habeas relief functions as a 'guard against extreme malfunctions in the state criminal justice systems,' and not as a means of error correction." Looking to its very recent holding in Cullen v. Pinholster, 563 U.S. ___, 131 S. Ct. 1388, 179 L. Ed.2d 557 (2011), the Supreme Court went on to observe "that review under §2254(d)(1) is limited to the record that was before the state court that adjudicated the prisoner's claim on the merits. Further, the Supreme Court explained:

> ... §2254(d)(1) requires federal courts to 'focus on what a state court knew and did,' and to measure state-court decisions 'against this Court's precedents *as of the time the state court renders its decision.*" (emphasis in original and quoting Cullen, 131 S. Ct. at 1399, 179 L. Ed.2d at 570). ... Finality occurs when direct state appeals have been exhausted and a petition for writ of certiorari from this Court has become time barred or has been disposed of.

Greene, 181 L. Ed.2d at 340-341.

13

unreasonably applies the correct legal rule to the particular facts, unreasonably extends a legal principle to a new context, or unreasonably refuses to extend the principle to a new context where it should apply." Breakiron v. Horn, 642 F.3d 126, 131 (3d Cir. 2011)(quoting McMullen, supra.) This test "is an objective one - a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly;" instead, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id,(quoting Harrington v. Richter, ___ U.S. ___, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011), Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004) and McMullen, supra.)

However, the §2254(d) standard is only applicable to "claims already adjudicated on the merits in State court proceedings." Arman v. McKean, 549 F.3d at 288 (quoting Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001)(quoting §2254(d))).[9] And, review under

---

[9] State court adjudication "on the merits" has been defined as follows:

> A matter is "adjudicated on the merits" if there is a "decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other ground." Section 2254(d) applies regardless of the procedures employed or the decision reached by the state court, as long as a substantive decision *was* reached; the adequacy of the procedures and of the decision are addressed through the lens of §2254(d), not as a threshold matter.

Boyd v. Waymart, 579 F.3d 330, 334 (3d Cir. 2009) (quoting Teti v. Bender, 507

§2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.  Pinholster, 131 S. Ct. at 1398, 179 L. Ed.2d at 570.  If the state court 'did not decide the merits of a claim being presented in an applicant's federal habeas petition, the §2254(d) standard does not apply and a federal court must apply the pre-AEDPA standard and review pure legal issues and mixed questions of law and fact de novo.  Id.; Nicoloudakis v. Abraham, 296 Fed. Appx. 280, 284 (3d Cir. 2008). See also, Lark v. Pennsylvania Department of Corrections, 645 F.3d 596, 618 (3d Cir. 2011)("When, as here, the state courts do not adjudicate a claim on the merits, and that claim is presented properly to a federal court in a petition for a writ of habeas corpus, the deferential standards of the AEDPA do not apply.") However, in these instances, "the state court's factual determinations are still presumed to be correct, rebuttable upon a showing of clear and convincing evidence."  Appel, 250 F.3d at 210; Porter v. Horn, 276 F. Supp. 2d 278, 296 (E.D. Pa. 2003). See also, Palmer v. Hendricks, 592 F.3d 386, 392 (3d Cir. 2010)(same).

Distilled to its essence and "[c]onsistent with Supreme Court precedent, the Third Circuit has read §2254(d) as requiring three distinct legal inquiries."  Rountree v. Balicki, 640 F.3d 530, 537 (3d Cir. 2011)(citing Harrington v. Richter, __ U.S. __,

F.3d 50, 56-57 (1st Cir. 2007)).

131 S. Ct. 770, 785, 178 L. Ed.2d 624 (2011)). "The first, is whether the state court decision was 'contrary to clearly established Federal law, as determined by the Supreme Court of the United States.'" Id. "The second is whether the state court decision 'involved an unreasonable application of' such law; ... [a]nd the third is whether the state court decision 'was based on an unreasonable determination of the facts in light of the evidence presented' to the state court." Id,(citing §§2254(d)(1) and (2)). *In accord,* Coombs v. Diguglielmo, 616 F.3d 255, 260 (3d Cir. 2010) (quoting Holloway v. Horn, 355 F. 3d 707, 718 (3d Cir. 2004) and 28 U.S.C. §2254(d)(1) & (2)).[10]

### B. *Petitioner's Claims*

*1. Violation of Constitutional Rights During Jury Selection.*

Petitioner asserts that he is entitled to relief from his conviction because his constitutional rights were violated during the jury selection process. In this regard, Petitioner invokes the rule of law first enunciated by the U.S. Supreme Court in

---

[10] Further, under the "unreasonable application" prong of §2254(d)(1), "the question ... is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 127 S. Ct. 1933, 1939, 167 L. Ed. 2d 836 (2007); Abu-Jamal v. Horn, 520 F. 3d 272, 279 (3d Cir. 2008), *vacated on other grounds*, Beard v. Abu-Jamal, 130 S. Ct. 1134, 175 L. Ed. 2d 967 (2010). Again, "[u]nder §2254(d)(1)'s 'unreasonable application' clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Rountree, supra, (quoting Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166, 155 L. Ed.2d 144 (2003)), "Rather, 'the state court's application of clearly established law must be objectively unreasonable' before a federal court may grant the writ." Id.(quoting Id.).

Strauder v. West Virginia, 10 Otto 303, 100 S. Ct. 303, 25 L. Ed. 664 (1880) and subsequently refined by Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) and its progeny, that a defendant is denied equal protection of the laws when he is put on trial before a jury from which members of his race, ethnicity, or sex have been purposefully excluded and that the use of peremptory challenges to accomplish this discriminatory objective is unconstitutional.  See also, Rivera v. Illinois, 556 U.S. 148, 129 S. Ct. 1446, 1451, 173 L. Ed. 2d 320 (2009)("Under Batson v. Kentucky, [full citation omitted] and later decisions building upon Batson, parties are constitutionally prohibited from exercising peremptory challenges to exclude jurors on the basis of race, ethnicity or sex."); J.E.B. v. Alabama, 511 U.S. 127, 140, 114 S. Ct. 1419, 1427, 128 L. Ed. 2d 89 (1994) ("Discrimination in jury selection, whether based on race or on gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process.")

Among the changes that Batson wrought to then-existing law was a change to the burden of proof previously required of a complaining defendant.  In Swain v. Alabama, 380 U.S. 202, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965), the Supreme Court had recognized the unlawfulness of a prosecutor using his peremptory challenges "to exclude blacks from the jury 'for reasons wholly

17

unrelated to the outcome of the particular case on trial' or to deny blacks 'the same right or opportunity to participate in the administration of justice enjoyed by the white population.'" Nevertheless, the Supreme Court opined that to succeed in establishing a *prima facie* case of purposeful discrimination, a black defendant had to prove that the peremptory challenge system was thereby "being perverted." See Batson, 476 U.S. at 91, 106 S. Ct. at 1720 (quoting Swain, 380 U.S. at 224, 85 S. Ct. at 838). According to Swain, "an inference of purposeful discrimination would be raised on evidence that a prosecutor, 'in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries." Swain, 380 U.S. at 224. This pronouncement in Swain became interpreted as a requirement that "proof of repeated striking of blacks over a number of cases was necessary to establish a violation of the Equal Protection Clause," thereby placing on defendants "a crippling burden of proof" and rendering "prosecutors' peremptory challenges ... largely immune from constitutional scrutiny." Batson, 476 U.S. at 92-93, 106 S. Ct. 1720-1721.

Batson altered this evidentiary burden. Post Batson, a

defendant may make out a *prima facie* case of purposeful discrimination in selection of the petit jury solely with evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial alone - it is no longer necessary to show a prior pattern of discrimination. Batson, 476 U.S. at 96, 106 S. Ct. at 1723; Abu-Jamal v. Horn, 520 F.3d 272, 279 (3d Cir. 2008), *vacated and remanded on other grounds,* 130 S. Ct. 1134, 175 L. Ed. 2d 967 (2010); Hardcastle v. Horn, 368 F.3d 246, 255 (3d Cir. 2004). To establish such a case, the defendant first must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Batson, 476 U.S. at 96. "Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate." Id. (quoting Avery v. Georgia, 345 U.S. 559, 562, 73 S. Ct. 891, 892, 97 L. Ed. 1244 (1953)). "Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." Id.

Batson has thus been described as having "established a three-step inquiry for determining the constitutionality of challenged peremptory strikes." Coombs, 616 F.3d at 261 (quoting

*Hardcastle*, 368 F.3d at 255 and <u>Riley v. Taylor</u>, 277 F.3d 261, 275 (3d Cir. 2001)).  When a <u>Batson</u> challenge is raised, the trial court first must determine whether the defendant has made a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of race.  <u>Id</u>.  Once the defendant makes a *prima facie* showing of racial discrimination, the prosecution must then articulate a race-neutral explanation for its use of peremptory challenges.  <u>Hardcastle</u>, <u>supra</u>; <u>Riley</u>, 277 F.3d at 275.  If the prosecution does so, it is then incumbent upon the trial court to determine whether the defendant has established purposeful discrimination by considering all of the circumstances that bear upon the issue of racial animosity.  <u>Coombs</u>, <u>supra</u>. (citing <u>Snyder v. Louisiana</u>, 552 U.S. 472, 478, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008)).  Among the "relevant circumstances" courts may consider in deciding whether a defendant has established a prima facie case of racial discrimination are: (1) a pattern of strikes against particular jurors included in the venire; (2) the prosecutor's questions and statements during voir dire examination and in exercising his challenges; (3) how many members of the cognizable racial group are in the venire panel; (4) the nature of the crime; and (5) the race of the defendant and the victim.  <u>Lewis v. Horn</u>, 581 F.3d 92, 102-103 (3d Cir. 2009); <u>Abu-Jamal</u>, 520 F.3d at 288; <u>Simmons v. Beyer</u>, 44 F.3d 1160, 1167 (3d Cir. 1995); <u>United States v. Clemons</u>, 843 F.2d

741, 748 (3d Cir. 1988).

Finally, as the burden of persuasion rests at all times with, and never shifts from, the opponent of the strike (*i.e.*, the defendant), the inquiry does not end even if the State produces a frivolous or utterly nonsensical justification for its strike; it merely proceeds to step three. Johnson v. California, 545 U.S. 162, 171, 125 S. Ct. 2410, 2417, 162 L. Ed. 2d 129 (2005) (citing Purkett v. Elem, 514 U.S. 765, 768, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995); Riley, 277 F.3d at 275). Hence, it is not until this third step (in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination) that the persuasiveness of the justification becomes relevant, assuming that the trial judge has the benefit of all relevant circumstances, including the prosecutor's explanation. Johnson, 545 U.S. at 169, 171, 125 S. Ct. at 2417.

In examining the transcripts from the voir dire in Petitioner's case, we first note that Petitioner's counsel never objected to the prosecutor's use of any of his peremptory strikes over the four-day period that it took to empanel the jury.[11]

---

[11]   The Third Circuit has recognized that numerous evidentiary problems are presented when a timely objection has not been made, and it has therefore expressed its belief that a timely objection is required to preserve a Batson issue on appeal. Abu-Jamal, 520 F.3d at 284, & n.11. Indeed, our review of the record in this matter discloses that the only alleged improprieties raised by Petitioner's trial counsel were to the trial court's decisions (1) to deny Petitioner's "challenges for cause as to prospective jurors Snyder and Paster, when the Court forbade counsel to ask whether their belief in capital

Because <u>Batson</u> relies on trial judges "to decide if the circumstances concerning the prosecutor's use of peremptory challenges create a *prima facie* case of discrimination," a timely objection is a pre-requisite to raising and preserving a <u>Batson</u> claim for appeal and failing to do so will result in forfeiture of the claim. <u>Lewis</u>, 581 F.3d at 102 (quoting <u>Batson</u>, 476 U.S. at 97, 106 S. Ct. 1712). The Commonwealth, of course, makes this very argument to which the petitioner rejoins that his trial counsel rendered ineffective assistance of counsel by failing to object and that there is therefore no procedural bar to this court addressing the <u>Batson</u> claim.[12]

The test for ineffective assistance of counsel is a well-settled and firmly established one containing two components. "First, the defendant must show that counsel's performance was

_____

punishment would render them more likely to convict petitioner of murder in the first degree," and (2) to allow "the Commonwealth to 'death qualify' the jury, thereby preventing petitioner from empaneling a fair and impartial jury." (Petitioner's Supplemental Post Verdict Motions, ¶19 and Petitioner's Nunc Pro Tunc Post Verdict Motions, ¶9.) After hearing brief oral argument, the post-verdict motions were summarily denied by the trial judge immediately before he formally sentenced the petitioner to death. (N.T. 6/12/87, 47).

[12] Moreover, although Petitioner raised a <u>Batson</u> challenge for the first time on PCRA review before the Pennsylvania state courts, in reliance upon the fugitive forfeiture rule, the Pennsylvania courts did not reach the merits of the <u>Batson</u> claim. As a consequence, "...our review of that claim is not subject to AEDPA's deferential standard, and we therefore afford *de novo* review. Nevertheless, we still presume that the state courts' conclusions of facts are correct unless, *inter alia*, they are not 'fairly supported by the record.'" <u>Coombs</u>, 616 F.3d at 261 (quoting 28 U.S.C. §2254(d)(8) and <u>Holloway v. Horn</u>, 355 F.3d 707, 719 (3d Cir. 2004)). Stated otherwise, "[w]hen, as here, the state courts do not adjudicate a claim on the merits, and that claim is presented properly to a federal court in a petition for a writ of habeas corpus, the deferential standards of the AEDPA do not apply," and the "federal habeas corpus court considering [a] <u>Batson</u> claim based on the Commonwealth's pattern of jury strikes should exercise *de novo* review." <u>Lark v. Secretary, Pennsylvania Department of Corrections</u>, 645 F.3d 596, 618 (2011).

deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984).  "Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Id.  To establish deficient performance, a "defendant must show that counsel's representation fell below an objective standard of reasonableness."  Lewis v. Horn, 581 F.3d at 106 (quoting Strickland, 466 U.S. at 688, 104 S. Ct. 2052).

In analyzing this first prong of the Strickland test, there is a strong presumption that counsel performed reasonably.  Id. (citing Strickland, 466 U.S. at 689).  To establish prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Saranchak v. Beard, 616 F.3d 292, 301 (3d Cir. 2010) (quoting Strickland, 466 U.S. at 694).  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Lewis, at 106-107.  It is generally advisable to consider the prejudice prong before examining the performance of counsel prong because this course of action is less burdensome to defense counsel.  United States v.

Booth, 432 F.3d 542, 546 (3d Cir. 2005); United States v. McCoy, 410 F.3d 124, 132, n.6 (3d Cir. 2005); Jones v. United States, 2010 U.S. Dist. LEXIS 106189, at *8 (W.D. Pa. Oct. 5, 2010).

In application of the foregoing, we first state the obvious: as an African-American, Petitioner is clearly a member of a cognizable racial group, and the nature of the crimes with which he was charged and stands convicted were the first degree murders of two African-American teenagers. Accordingly, any prejudice that was likely to inure against Mr. Judge for the commission of a crime against someone of a different race and/or ethnicity is not an issue here.

We thus examine the record in this matter in an effort to (1) ascertain how many members of the cognizable racial group were in the jury panel and whether there existed a pattern of strikes against particular jurors in the panel, and (2) to evaluate the prosecutor's questions and statements during voir dire and in exercising his challenges. It appears from the exhibits attached to Petitioner's reply to the Commonwealth's answer to the habeas corpus petition that Petitioner's jury was ultimately composed of 9 men and 4 women. Of these jurors, at least 5 were Caucasians - 3 men and 2 women, and at least 5 were African-Americans - 3 men and 2 women.[13] A total of 87 people

---

[13] Although Petitioner has produced documentary evidence to substantiate the racial make-up of only 25 members of the venire panel, he asserts at pages 81-85 of his Reply to Respondent's Answer to Petition for a Writ of Habeas Corpus that Juror Nos. 3, 6, and 7 (two men and one woman) were

24

were individually voir dired - 35 men and 52 women.  Of this group, 42 were subsequently excused or challenged for cause.  Of those excused or challenged for cause, 16 were men, and 26 were women.

The record also reflects that the Commonwealth exercised a total of 14 peremptory challenges and that the defense exercised 15 peremptory challenges.  As noted above, Petitioner has provided evidence of the racial makeup of 29 members of the venire: 7 Caucasian men, 6 African-American men, 8 Caucasian women, and 8 African-American women.  Of these known venirepersons, the Commonwealth exercised peremptory challenges to strike 5 of 14 known African-Americans - 3 women and 2 men.[14] It likewise peremptorily challenged 3 of 15 known Caucasians - 2 women and 1 man.  In total, the Commonwealth exercised its peremptories to strike 10 women and 4 men.  These figures correlate to a 35.7% strike rate for African-Americans in general, a 71.4% strike rate for women in general, an exclusion

---

also African-American and that the remaining alternate juror was a white male. We shall accept Petitioner's assertions for analysis at least of this issue. In addition, at least two other African-Americans were initially placed on Petitioner's jury - 1 man and 1 woman. However, these jurors were excused prior to the start of the trial--one because of a sudden death in his family and the other because she resided in the neighborhood where the crime took place and she feared for the safety of her children.  (N.T. 4/6/87, 49-52; 4/8/87, 4-6.)

[14]  Although Petitioner asserts that he has identified 6 African-American venirepersons who were peremptorily stricken by the Commonwealth, we can only identify 5.  See, Petitioner's Consolidated Petition for Writ of Habeas Corpus, p. 32, n. 17. Inasmuch as it is the petitioner's burden to demonstrate a *prima facie* <u>Batson</u> violation, on this point we consider only those African-American venirepersons of whose racial identities there is objective evidence on the record.

rate of 35.7% against African-Americans in general, and a 38% exclusion rate for women in general.[15]  It is quite conceivable that the strike and exclusion rates for African Americans may well have been higher, given that we do not know the racial identity of 58 of the 87 members of the venire.

In further support of his claims, Petitioner has provided a copy of the transcript from a training video made sometime in 1987 by then-prosecutor Jack McMahon for the Philadelphia District Attorney's Office.  In that video, Mr. McMahon opined that "smart people," social workers, doctors, lawyers, teachers, "real educated blacks," "people from 33rd and Diamond" or "people from North Philly," "the town idiot," and "young black women" made bad jurors for the Commonwealth.  (Exhibit "M" to Petitioner's Appendix to Consolidated Petition for Writ of Habeas Corpus, 19-22, 47, 50-53, 55-57, 62-65.)  On the other hand, Mr. McMahon advised picking "older black men," "blacks from the South," "middle class people that are well dressed," and "stable, conservative people," which can be determined by asking potential jurors questions about "their married life, their background, how long they've been married, how long they've been employed,

---

[15]  See generally Abu-Jamal v. Horn, 520 F.3d at 290 ("The strike rate is computed by comparing the number of peremptory strikes the prosecutor used to remove black potential jurors with the prosecutor's total number of peremptory strikes exercised.  This statistical computation differs from the 'exclusion rate,' which is calculated by comparing the percentage of exercised challenges used against black potential jurors with the percentage of black potential jurors known to be in the venire.")

whether they've been schooled, how long they stayed in school,
... how they're dressed." (Exhibit "M", 46-49, 55-58.) To get
the latter type of jurors and to disqualify the former type,
McMahon recommended asking leading questions and asking "more
questions of those people so it gives you more ammunition to make
an articulable reason as to why you are striking them, not for
race." (Exhibit "M," 16-19, 71.)

Although Petitioner points to various examples of alleged
disparities in the prosecutor's voir dire questioning of several
different members of the venire, after carefully scrutinizing the
transcripts in their entirety, we find no evidence of disparate
treatment. While it is true that in certain instances, the
prosecutor asked fewer questions of the known white men who were
eventually empaneled than he did of a number of the women and/or
known African-Americans who were subsequently excused or
challenged for either cause or via peremptory, it appears that
this was only because the defense attorney had already elicited
the additional information through his questioning.[16] Our review
of the voir dire as a whole, however, does leave us with
questions as to the reasons behind a number of the Commonwealth's
peremptory challenges - Cherylann Lowry, who was from North

---

[16] The Supreme Court has recognized that the manner in which members of
a venire are questioned may be relevant in a Batson inquiry where a divergence
in responses can be attributed to a racially disparate mode of examination.
See, Miller-El v. Cockrell, 537 U.S. 322, 332, 123 S. Ct. 1029, 1037, 154 L.
Ed.2d 931 (2003).

Philadelphia, Celia Floyd, who was from Logan, Lisa Corbett, who was from Mt. Airy, (N.T. 4/2/87, 56-64, 83-87), Nathan Lewis, of North Philadelphia, Edna Slater, who was from Tioga (N.T. 4/3/87, 50-64, 88-94), Lorene Mixson of South Philadelphia, and Claud Johnson from Southwest Philadelphia (N.T. 4/6/87, 68-73, 200-204), as we cannot discern a basis for striking these jurors from the existing record.[17]  Of these potential jurors, there is objective evidence that Celia Floyd and Edna Slater were African-American, as were Nathan Lewis and Claud Johnson.  Both Edna Slater and Nathan Lewis were also teachers.  In view of this evidence, it appears that Prosecutor Long may indeed have implemented some of Mr. McMahon's taught strategies.

Finally, Petitioner also appends a number of affidavits from members of the criminal and capital defense bar in Philadelphia County during the time period in which he was tried, as well as an affidavit from a proposed expert witness, Dr. David Baldus, attesting to the statistically greater likelihood of a black

---

[17]  Upon still closer scrutiny of the transcripts from the voir dire, we find that of the two men of either white or unknown ethnicity, both expressed some reservations about the death penalty whereas we find no similar easily-discernable reason for the Commonwealth's decision to peremptorily strike the two African-American men (Nathan Lewis and Claud Johnson).  With respect to the women, we note that two of the women of unknown ethnicity gave vague, confusing and often inconsistent answers about whether they could follow the judge's instructions and find the death penalty appropriate, one of the African-American women and one of the Caucasian women had brothers who had been convicted of serious crimes and the African-American woman also expressed concern that the age of the victims might bother her because she had three children all around the same ages.  We could find no other easily discernable reasons for the prosecutor's decision to peremptorily strike any of the other women.

defendant receiving the death penalty than a white defendant and to the pattern and practice of the Philadelphia District Attorney's office to use peremptory strikes to remove certain minority members from jury panels. (Exhibits "K", "L" and "N" to Petitioner's Appendix to Consolidated Petition for Writ of Habeas Corpus.) Notably, the Third Circuit has held that striking just a single juror may constitute a *prima facie* case and that the mere presence of a single black on a jury does not necessarily prevent a finding of a *prima facie* case. See Simmons v. Beyer, 44 F.3d 1160, 1167-68 (3d Cir. 1995); Jones v. Ryan, 987 F.2d 960, 971 (3d Cir. 1993); United States v. Clemons, 843 F.2d 741, 747 (3d Cir. 1988). Indeed, "Batson was 'designed to ensure that a State does not use peremptory challenges to remove *any* black juror because of his race,' and thus a prosecutor's decision to refrain from discriminating against some African American jurors does not cure discrimination against others." Brinson v. Vaughn, 398 F.3d 225, 233 (3d Cir. 2005)(quoting Batson, 476 U.S. at 99, n. 22, 106 S. Ct. 1712 (emphasis added)). Thus, while Petitioner's jury on its face appears evenly balanced, we find that we cannot assess the prejudice prong of the Strickland test without hearing from the prosecutor. Insofar as we are vested with discretion to determine the propriety of permitting discovery in §2254 cases and "[a] district court abuses its discretion when discovery is 'essential for the habeas petitioner

to develop fully his underlying claim,'" we are constrained to grant Petitioner's request for a brief evidentiary hearing solely for the purpose of hearing Mr. Long explain why he elected to peremptorily strike the known African-American and female jurors. Williams v. Beard, 637 F.3d 195, 209 (3d Cir. 2011)(quoting Smith v. Mahoney, 611 F.3d 978, 997 (9th Cir. 2010)).

   *2.  Defendant's Competency to Stand Trial*

   Petitioner next asserts that his trial counsel was ineffective and his due process rights were violated by the failure of his trial counsel to investigate his competency to stand trial and to request the trial court to conduct a hearing to ascertain whether he was mentally competent to stand trial. The Commonwealth of course again submits that this claim is procedurally defaulted but, in any event, the record demonstrates that Petitioner was competent to be tried.

   Because the criminal trial of an incompetent defendant violates due process, the Third Circuit has observed that the Due Process Clause of the Constitution requires a trial attorney to seek a competency hearing in any case "in which there is reason to doubt the defendant's competence to stand trial."  See, Cooper v. Oklahoma, 517 U.S. 348, 354, 116 S. Ct. 1373, 1376, 134 L. Ed.2d 498, 506 (1996); Medina v. California, 505 U.S. 437, 453, 112 S. Ct. 2572, 2581, 120 L. Ed.2d 353 (1992); Pate v. Robinson, 383 U.S. 375, 385, 86 S. Ct. 836, 838, 15 L. Ed.2d 815, 818

(1966); <u>Cherys v. United States</u>, 405 Fed. Appx. 589, 592, 2011 U.S. App. LEXIS 553 (3d Cir. Jan. 10, 2011)(quoting <u>U.S. v. Haywood</u>, 155 F.3d 674, 680 (3d Cir. 1998)).  Similarly, "a trial court's failure to inquire into competency, *sua sponte*, where there is reason to doubt a defendant's competency, violates due process because it deprives the defendant of his right to a fair trial."  <u>Taylor v. Horn</u>, 504 F.3d 416, 433 (3d Cir. 2007)(citing <u>Drope v. Missouri</u>, 420 U.S. 162, 172, 95 S. Ct. 896, 43 L. Ed.2d 103 (1975)).  "But barring indicia of incompetence, due process does not require that a competency hearing be held."  <u>Id</u>.

"The test for incompetence is also well settled.  A defendant may not be put to trial unless he 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him.'" <u>Cooper</u>, 517 U.S. at 354, 116 S. Ct. at 1377(quoting <u>Dusky v. United States</u>, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed.2d 824 (1960)); *In accord*, <u>Hummel v. Rosemeyer</u>, 564 F.3d 290, 303 (3d Cir. 2009). "Requiring a criminal defendant to be competent has a modest aim: it seeks to ensure that he has the capacity to understand the proceedings and to assist counsel."  <u>Godinez v. Moran</u>, 509 U.S. 389, 402, 113 S. Ct. 2680, 2688, 125 L. Ed.2d 321 (1993); <u>United States v. Tucker</u>, No. 05-CR-440-10,  2010 U.S. Dist. LEXIS 91754 at *11 (E. D. Pa. Sept. 3, 2010).  Thus the competency standard

includes both (1) whether the defendant has "a rational as well as factual understanding of the proceedings against him" and (2) whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." Indiana v. Edwards, 554 U.S. 164, 128 S. Ct. 2379, 2383, 171 L. Ed. 2d 345 (2008)(quoting Dusky, supra.).

Although "[t]he Supreme Court has not 'prescribed a general standard with respect to the nature or quantum of evidence necessary to require resort to an adequate procedure,' ... it has explained:

> a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts."

Taylor, 504 F.3d at 433 (quoting Drope, 420 U.S. at 172, 180, 95 S. Ct. 896). Thus, "[c]ounsel's failure to request the trial court to order a hearing or evaluation on the issue of the defendant's competency could violate the defendant's right to effective assistance of counsel provided there are sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt the defendant's competency, and there is a reasonable probability that the defendant would have been found

incompetent to stand trial had the issue been raised and fully considered." Taylor, at 438 (quoting Jermyn v. Horn, 266 F.3d 257, 283 (3d Cir. 2001).

As evidentiary support for the claim of incompetency, Petitioner has provided copies of three prior, psychiatric evaluations conducted by the Psychiatric Evaluation Unit of the Philadelphia County Court of Common Pleas' Probation Department dated 11/18/80, 3/11/82 and 11/5/86 (Exhibit "H" to Appendix to Consolidated Petition for Writ of Habeas Corpus), and two Confidential Psychological Reports written in May, 1972 by the Psycho-Educational Clinic at Temple University concerning Petitioner when he was ten years old. (Exhibits "I" and "J" to Appendix to Consolidated Petition for Writ of Habeas Corpus). Also provided is a Declaration from Julie Kessel, M.D., a Board Certified Psychiatrist who evaluated Petitioner in 1999. (Exhibit "F" to Appendix to Consolidated Petition for Writ of Habeas Corpus). The Temple reports indicate that Mr. Judge had problems with social immaturity, feelings of dependency, loneliness, inadequacy, anxiety, attention and suffered from low self-esteem and self-confidence from an early age. Although he was found to be of average intelligence and generally functioning at grade level for his age at the time (5th grade), his low power of concentration and need for approval and acceptance by others were believed to be among the causes for his failing marks. Despite

33

the fact that the evaluating clinicians made numerous recommendations to Mr. Judge's parents and teachers, there is no evidence on the record that these recommendations were ever followed.

According to the court-ordered evaluations, the last of which was some five months before his trial in this case, Petitioner was diagnosed as suffering from paranoid and schizoid personality disorders, anti-social personality disorder, mixed-character disorder with strong passive-aggressive features and constricted affect, and concreteness of thought. He was also found to be aloof and guarded and unable to make or maintain close personal relationships. He was each time adjudged to be competent to stand trial and be sentenced, as he was found to be well-aware of his legal situation and capable of obtaining proper counseling from his attorney and to assist in the preparation of his case. (Exhibit "H").

In Dr. Kessel's opinion, which appears to have been solicited by Petitioner's current counsel, Mr. Judge suffers from Schizotypal Personality Disorder. As part of this disorder, which is marked by magical thinking and distortions of reality, Petitioner demonstrates significant disorganization in his thought processes, has difficulty understanding the relationship between one idea and another, in interpreting the expressions and emotions of others and with demonstrating appropriate emotional

responses to situations.  He also cannot make rational judgments
without the help of others and has trouble understanding the
consequences of his behavior.  Dr. Kessel is further of the
opinion

> "that in 1984 and for most of his life, Roger Judge suffered
> from an extreme mental and emotional disturbance.  It is
> further my opinion that as a result of these disturbances
> his capacity to appreciate the criminality of his conduct
> and to conform his conduct to the requirements to the law
> was substantially impaired."

(Exhibit "F", p. 5, ¶11).

As still further evidence of Petitioner's lack of mental
competency, he relies on the transcripts from his trial in this
matter where, according to his current counsel,

> Petitioner took the stand at trial and began to decompensate
> -- literally before the eyes of trial counsel, the court,
> and the jury – and to spin magical and incomprehensible
> stories.  He had trouble understanding the questions posed
> to him, and could not follow through with his own thoughts,
> let alone the complexities of direct and cross-examination.

(Consolidated Petition for Writ of Habeas Corpus and Memorandum
of Law, p. 54, ¶123).

After reviewing the transcript of Petitioner's testimony at
trial in its entirety, we find that while there were points at
which it was difficult to follow Petitioner's train of thought
and comprehend what he was saying, his testimony on the whole was
coherent, though it often appeared evasive, self-serving,
incredible and therefore ill-advised.  (N.T. 4/13/87, pp. 32-98).
Earlier on that same day, Mr. Judge discussed with his counsel

whether or not to dismiss one of the jurors because he appeared to be under the influence and was overheard attempting to discuss the case with the others prematurely. (N.T. 4/13/87, p. 10). A short while later, Mr. Judge and his attorney conferred on whether to release one of the proposed defense witnesses from testifying and still later, Petitioner was colloquyed on his decision to testify in his own behalf. (N.T. 4/13/87, pp. 2-10, 29-32). At all times, the record reflects that Petitioner seems to have understood the matters under consideration, was able to discuss them with his attorney and make a decision subsequent to that discussion on how to handle the issues which arose.

We do not doubt that Petitioner is and has for most of his life been, mentally ill or that at the time of the Outterbridge and Mitchell murders and at the time he was tried, that he was suffering from a number of mental illnesses. The law, however, does not necessarily equate mental illness with incompetency to stand trial. Indeed, the questions before us are whether the defendant has "a rational as well as factual understanding of the proceedings against him" and whether he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." Indiana v. Edwards, 128 S. Ct. at 2383. Based upon the record in this matter, we are constrained to answer both of these questions in the affirmative. And, in the absence of sufficient indicia of incompetence to give objectively

36

reasonable counsel a basis for doubting his client's competency
and a showing of a reasonable probability that the defendant
would have been found incompetent to stand trial had the issue
been raised and fully considered, we cannot find Mr. Judge's
trial counsel to have been constitutionally ineffective for
failing to seek such an assessment of Petitioner here.  As a
result, we decline to grant the writ on the basis that Petitioner
was incompetent to be tried.

> *3.  Failure to Instruct the Jury that Petitioner Would Be
> Statutorily Ineligible for Parole if Sentenced to Life In
> Prison.*

Petitioner also seeks habeas relief on the grounds that the
trial court's failure to instruct the sentencing jury that he
would be ineligible for parole if sentenced to life imprisonment
for the murders was violative of his rights under the Eighth and
Fourteenth Amendments to the U.S. Constitution.  More
particularly, Mr. Judge contends that this failure violated his
Fourteenth Amendment liberty interest and right to due process by
subjecting him to a sentence imposed on the basis of inaccurate
information that was material to the sentencing decision and
which he had no chance to rebut or explain, and denied him the
heightened procedural safeguards required in capital cases
resulting in an arbitrary and capricious sentence in violation of
the Eighth Amendment.

The Fourteenth Amendment clearly states in relevant part

that "[n]o ...State shall ... deprive any person of life, liberty, or property without due process of law..."  The Supreme Court has made it clear that, in criminal cases, "the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause."  <u>Gardener v. Florida</u>, 430 U.S. 349, 358, 97 S. Ct. 1197, 1204, 51 L. Ed.2d 393 (1977). While "the fact that due process applies does not implicate the entire panoply of criminal trial procedural rights," ... "once it is determined that due process applies, the question remains what process is due."  <u>Gardner</u>, 430 U.S. at 356, n.9, 358 (citing <u>Morrissey v. Brewer</u>, 408 U.S. 471, 481, 92 S. Ct. 2593, 2600, 33 L. Ed.2d 484 (1972)).  Indeed, "due process is a flexible concept and thus once it has been determined that some process is due," the law recognizes that "not all situations calling for procedural safeguards call for the same kind of procedure." <u>Morrissey</u>, <u>supra</u>.

As noted, Petitioner also asserts that the trial judge's failure to provide a life without possibility of parole instruction to the sentencing jury constituted a violation of the Eighth Amendment prohibition against cruel and unusual punishment.  Specifically, the Eighth Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  The Supreme Court, of course, has held that "a penalty should be

considered unusually imposed if it is administered arbitrarily or discriminatorily." Furman v. Georgia, 408 U.S. 238, 249, 92 S. Ct. 2726, 2732, 33 L. Ed.2d 346 (1972). Punishments that are "cruel and unusual" are also defined as those punishments that are "excessive." Gregg v. Georgia, 428 U.S. 153, 173, 96 S. Ct. 2909, 2925, 49 L. Ed. 2d 859 (1976). In considering forms of punishment in the abstract (*i.e.*, whether capital punishment may ever be imposed as a sanction for murder), "the inquiry into 'excessiveness' has two aspects. First, the punishment must not involve the unnecessary and wanton infliction of pain;" and "[s]econd, the punishment must not be grossly out of proportion to the severity of the crime." Id, (citing, *inter alia*, Furman, 408 U.S. at 392-393, 92 S. Ct. at 2805-06 and Trop v. Dulles, 356 U.S. 86, 100, 78 S. Ct. 590, 597, 2 L. Ed.2d 630 (1958). Moreover, the Eighth Amendment requires that, in capital cases, "the sentencer not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Skipper v. South Carolina, 476 U.S. 1, 4, 106 S. Ct. 1669, 1670-1671, 90 L. Ed.2d 1 (1986)(quoting Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S. Ct. 869, 874, 71 L. Ed.2d 1 (1982); Lockett v. Ohio, 438 U.S. 586, 604, 98 S. Ct. 2954, 2964, 57 L. Ed.2d 973 (1978)).

In challenging the trial court's failure to so instruct the

jury, Petitioner in large measure relies on the Supreme Court's holding in Simmons v. South Carolina, 512 U.S. 154, 114 S. Ct. 2187, 129 L. Ed.2d 133 (1994). Specifically, the Court in that case held that due process requires that a sentencing jury be informed of a defendant's parole ineligibility where his future dangerousness is at issue and where he is, in fact, ineligible for parole. In Simmons, among the factors the prosecuting attorney urged the jury to consider in his closing argument was the potential for future danger posed by the petitioner "now that he is in our midst." The prosecution further argued that "a verdict for death would be 'a response of society to someone who is a threat. Your verdict will be an act of self-defense.'" Simmons, 512 U.S. at 157, 114 S. Ct. at 2190-2191. Simmons attempted to overcome the prosecutor's general argument of future dangerousness by presenting evidence that, "due to his unique psychological problems, his dangerousness was limited to elderly women" (one of whom he had been convicted of murdering and two of whom he had previously been convicted of robbing and assaulting), "and that there was no reason to expect further acts of violence once he was isolated in a prison setting." Id.

However, Simmons' counsel was concerned that the jury might not understand that in his client's case, a sentence of life imprisonment did not carry with it the possibility of parole. Consequently, defense counsel asked that the trial judge clarify

this issue by defining the term "life imprisonment" for the jury

in accordance with S.C. Code Ann. §24-21-640, which read:

> The board must not grant parole nor is parole authorized to
> any prisoner serving a sentence for a second or subsequent
> conviction, following a separate sentencing from a prior
> conviction, for violent crimes as defined in Section 16-1-
> 60.

The trial judge refused to give the requested instruction and

after deliberating on petitioner's sentence for 90 minutes, the

jury sent a note to the judge asking whether the imposition of a

life sentence carried with it the possibility of parole.  Over

petitioner's objection, the trial court instructed the jury as

follows:

> You are instructed not to consider parole or parole
> eligibility in reaching your verdict.  Do not consider
> parole or parole eligibility.  That is not a proper issue
> for your consideration.  The terms life imprisonment and
> death sentence are to be understood in their plan [sic] and
> ordinary meaning.

Less than half an hour later, the jury returned a verdict of

death for Simmons.  On appeal to the South Carolina Supreme

Court, Petitioner argued that the trial court's refusal to give

the jury accurate information about his parole ineligibility

violated his rights under the Eighth Amendment and the Due

Process clause of the Fourteenth Amendment.  Following the state

Supreme Court's rejection of his challenges, Simmons pursued and

was eventually granted federal habeas relief by the U.S. Supreme

Court.  After observing that "an instruction directing juries

that life imprisonment should be understood in its 'plain and

ordinary meaning' does nothing to dispel the misunderstanding reasonable jurors may have about the way in which any particular state defines 'life imprisonment,'" the Supreme Court held:

> Far from ensuring that the jury was not misled, however, this instruction actually suggested that parole *was* available, but that the jury, for some unstated reason, should be blind to this fact. Undoubtedly, the instruction was confusing and frustrating to the jury, given the arguments by both the prosecution and the defense relating to petitioner's future dangerousness, and the obvious relevance of petitioner's parole ineligibility to the jury's formidable sentencing task. ... But even if the trial court's instruction successfully prevented the jury from considering parole, petitioner's due process rights still were not honored. Because petitioner's future dangerousness was at issue, he was entitled to inform the jury of his parole ineligibility.

Simmons, 512 U.S. at 170-171, 114 S. Ct. at 2197-2198.

Simmons thus clearly stands for the proposition that, where the defendant's future dangerousness is at issue and state law prohibits the defendant's release on parole such that the only sentencing alternative available is life imprisonment without the possibility of parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible. See, Kelly v. South Carolina, 534 U.S. 246, 248, 122 S. Ct. 726, 728, 151 L. Ed.2d 670 (2002); Kindler v. Horn, 542 F.3d 70, 89-90 (3d Cir. 2008)(*vacated and remanded on other grounds*, 130 S. Ct. 612, 175 L. Ed.2d 417 (2009), *reaffirmed on remand*, 642 F.3d 398 (3d Cir. 2011)).

On review of the record in this action, we first observe that it does *not* appear that the Commonwealth raised the issue of

42

Petitioner's potential future dangerousness in its arguments to the jury. Accordingly, we discern no impropriety in the trial court's failure to instruct or advise the jury that Petitioner was not parole eligible in its sentencing charge. In addition, as the Commonwealth correctly asserts, under the 1997 U.S. Supreme Court decision in O'Dell v. Netherland, 521 U.S. 151, 117 S. Ct. 1969, 138 L. Ed.2d 351 (1997), the rule set out in Simmons was "new" within the meaning of Teague v. Lane, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed.2d 334 (1989) and is thereby inapplicable to and cannot be used to disturb Mr. Judge's death sentence which had been final for some two years when Simmons was decided.[18] See, O'Dell, 521 U.S. at 153, 117 S. Ct. at 1971; *In accord*, Laird v. Horn, 159 F. Supp.2d 58, 123 (E.D. Pa. 2001).

We likewise cannot grant relief either under the Eighth Amendment holdings of Eddings, Skipper, and Lockett, all of which precede Petitioner's trial in the instant case and mandate that a defendant be permitted to introduce evidence regarding any aspect of his character or record and any of the circumstances of the offense that may serve as a basis for a sentence less than death. Indeed, the threshold matter at issue here is the trial court's failure to instruct the sentencing jury that Petitioner would be

---

[18] Here, we note that Roger Judge's conviction became final on August 16, 1992, upon the expiration of the time for filing a petition for writ of *certiorari* to the U.S. Supreme Court. See, e.g., Lambrix v. Singletary, 520 U.S. 518, 527, 117 S. Ct. 1517, 1524, 137 l. Ed.2d 771 (1997)("Lambrix' conviction became final on November 24, 1986 when his time for filing a petition for *certiorari* expired."); SUP. CT. R. 13.

statutorily ineligible for parole under Pennsylvania law if he were to be sentenced to life imprisonment. The instruction itself is neither a mitigating circumstance nor a mitigating factor related to Petitioner's character and record. Rather, the instruction, standing alone, simply informs the jury of its sentencing options – a requirement that was not established until the decision in <u>Simmons</u>.

This does not entirely end our inquiry however because, in the course of their deliberations during the sentencing phase, the jury did make the following inquiry of the trial court: "Can you define 'life' in terms of parole or will he be incarcerated for life?" (N.T. 4/15/87, p. 89). In response to that question, the trial judge directed the jury as follows:

> "Ladies and Gentlemen of the Jury, you are not to decide this sentencing phase based on how long he is going to spend in jail or what life imprisonment means. I have given you the law. The Legislature has set out certain aggravating and mitigating factors for you to consider. You must make your decision based on what aggravating and what mitigating circumstances you find and as I explain it to you. And I don't want to go into that again because I don't think you have any difficulty with them, but that's what your decision must be based on, in accordance with the law. That's the law and it is not for any of us to consider 'life' or what it means. It is based solely on what aggravating factors you find and what mitigating factors you find. And that decision is being done in accordance with the law. Okay?"

(N.T. 4/15/87, pp. 89-90).

Petitioner further asserts that defense counsel was ineffective in not responding to this question with a request that Judge Sabo inform the jury that Petitioner was not eligible

for parole under state law and that "life meant life," and in not objecting to the above-referenced explanation given by the Court. Again, to establish prejudice under Strickland, supra, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Saranchak v. Beard, 616 F.3d 292, 301 (3d Cir. 2010) (quoting Strickland, 466 U.S. at 694). A reasonable probability is a probability sufficient to undermine confidence in the outcome." Lewis, at 106-107. Here, in view of the jury's specific request for a clarifying instruction, we find it to be reasonably probable that had defense counsel objected to the trial court's response and had the trial court explained that Petitioner was *not* eligible for parole by virtue of his first degree murder conviction, he would have received a sentence of life imprisonment in lieu of death.[19]

This conclusion is also in keeping with Third Circuit precedent. In Carpenter v. Vaughn, 296 F.3d 138 (3d Cir. 2002), the defendant was convicted of first degree murder and sentenced to death on January 20, 1984. Following the denial of post-trial motions and several petitions for relief under Pennsylvania's Post Conviction Relief Act, Carpenter petitioned for habeas

---

[19] We further observe that the sentencing jury took less than 3 hours to deliberate on the penalty to be imposed on Petitioner and it appears from the trial transcript that the verdict of death came very shortly after Judge Sabo's response to the parole eligibility question. (N.T. 4/15/87, pp. 87-90).

corpus relief in the U.S. District Court for the Middle District of Pennsylvania.  In affirming in part and reversing in part the District Court's holdings, the Third Circuit agreed that the defendant had been denied effective assistance of counsel during the penalty phase of the trial.  Specifically, the Third Circuit agreed that trial counsel was ineffective in failing to object to the judge's answer to a question asked by the jury during the course of its deliberations shortly before it returned its verdict of death.  Similar to the question posed by the jury in this case, Carpenter's jury inquired: "Can we recommend life imprisonment with a guarantee of no parole?"  The judge there responded:

> The answer is that simply, no absolutely not.  Moreover, ladies and gentlemen, you talk about recommendation.  I don't know exactly what you mean, but I assume you remember what I told you before, that you as a jury at this point are not making a recommendation of death or life imprisonment.  I hope you understand that.

> You folks are actually fixing the sentence, and not the Court.  It is not the recommendation.  Whether you mark on there death, that's the sentence and there is nothing this Court can do about it.  The Court has nothing to do on it.  If you mark life imprisonment, there is nothing this Court can do about it or wants to do about it, because that decision is entirely up to you as members of the jury.  So, I hope you understand that it is not a recommendation, it is a sentence that will bind all of us here to whatever you fix and it's going to have to be very simply death or life imprisonment.  And the question of parole is absolutely irrelevant.  I hope you understand that.

Carpenter, 296 F.3d at 156.  Granting the writ of habeas corpus in Carpenter's case, the Third Circuit noted:

On receiving the jury's question, the trial judge appears to have focused on the jury's use of the word "recommend" and to have overlooked the issue of parole. This was a situation in which assistance from counsel might very well have corrected the problem. The trial judge knew that Carpenter could not be paroled while serving a life sentence. If Carpenter's attorney had told the judge that his answer inadvertently conveyed the contrary impression and thus misstated Pennsylvania law on a point that could play a critical role in the jury's decision, we have little doubt that the judge would have corrected his answer. But counsel did not object. The failure to object under these circumstances fell beyond an objective standard of reasonableness, and there is a reasonable probability that, but for counsel's error, the jury would not have returned a verdict of death. ... We recognize that the trial judge ended his answer to the jury by stating that "the question of parole is absolutely irrelevant," but as a practical matter, this brief and weak statement was not likely to erase the highly prejudicial impact of the false impression that Carpenter might be paroled if he was not executed.

Id, at 157-158 (internal citations omitted).

In this case, we find that the trial judge's statement that "it is not for any of us to consider 'life' or what it means" was also sufficiently misleading to have dictated an objection from defense counsel based on prevailing professional norms. See, e.g., 18 Pa. C. S. §1102(a); 42 Pa. C. S. §9756(c)[20]; Commonwealth

---

[20]    Specifically, the version of the parole statute in effect at the time of Petitioner's trial, 42 Pa. C. S. A. §9756 read as follows in relevant part:

> **(c)    Prohibition of parole –** Except in the case of murder of the first degree, the court may impose a sentence of imprisonment without the right to parole only when:
>
>> (1) a summary offense is charged;
>>
>> (2) sentence is imposed for nonpayment of fines or costs, or both, in which case the sentence shall specify the number of days to be served; and
>>
>> (3) the maximum term or terms of imprisonment imposed on one or more indictments to run consecutively or concurrently total less

v. Yount, 419 Pa. Super. 613, 622, 615 A.2d 1316, 1320
(1992)(applying rules of statutory construction, parole statute
clearly and unambiguously provides exception in cases of murder
of the first degree.  Thus, "[d]espite appellant's arguments to
the contrary, we conclude that the statute unequivocally bars all
parole for first degree murderers whether the sentence is life or
death.")   The practical effect of this statement was to conceal
from the jury the fact that, under Pennsylvania law, Petitioner
would spend the rest of his life in prison and that he was not,
by virtue of his first degree murder conviction, a candidate for
parole or otherwise eligible for release, save through the
miracle of a pardon issued by the Governor.  Thus, in failing to
object, Petitioner's counsel was ineffective and thereby deprived
him of the "assistance of counsel" to which he was entitled under
the Sixth Amendment.  Therefore, we shall grant the writ on this
ground, as well.

   *4.   Failure of Petitioner's Trial Counsel to Investigate
   and Present Evidence of his Background and Mental Illness as
   a Mitigating Factor to the Sentencing Jury*

   Petitioner next claims entitlement to habeas corpus relief
from his death sentence for the reason that his Sixth Amendment
right to the effective assistance of counsel was violated as a
consequence of the failure of his trial attorney to investigate,
develop and present what he claims is "powerful mitigating

_____

than 30 days.

evidence" of his "mental illness or of his dysfunctional family upbringing" during the sentencing phase of his trial. (Consolidated Petition for Writ of Habeas Corpus, p. 112, ¶248).

Again, "[i]neffective assistance under Strickland is deficient performance by counsel resulting in prejudice, ... with performance being measured against an 'objective standard of reasonableness,' ... under 'prevailing professional norms.'" Rompilla v. Beard, 545 U.S. 374, 380, 125 S. Ct. 2456, 2462, 162 L. Ed.2d 360 (2005)(quoting Wiggins v. Smith, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed.2d 471 (2003) and Strickland, 466 U.S. at 687, 104 S. Ct. at 2052). Strickland likewise clearly dictates that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment." Id., 466 U.S. at 691, at 104 S. Ct. at 2066.

Additionally, the American Bar Association Standards for Criminal Justice have also long been considered guides to determining what is reasonable. Hummel v. Rosemeyer. 564 F.3d at 298, (citing, *inter alia*, Rompilla, 545 U.S. at 387 and Wiggins, 539 U.S. at 524). As noted in Rompilla, in 1989, the ABA first promulgated a set of guidelines specifically devoted to setting

forth the obligations of defense counsel in death penalty cases.

See, ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989). "Those Guidelines applied the clear requirements for investigation set forth in the earlier Standards to death penalty cases and imposed a similarly forceful directive: 'Counsel should make efforts to secure information in the possession of the prosecution or law enforcement authorities, including police reports.'" Id., 545 U.S. at 387, n.7, 125 S. Ct. at 2466, n.7.[21]

In Petitioner's case, the extent of the mitigation evidence presented on his behalf consisted of the testimony of just one witness - his mother, whose testimony was apparently[22] confined to the fact that Petitioner was a good son and a good father to his

---

[21] Note 7 in the Rompilla decision goes on to observe,

Later, and current, ABA Guidelines relating to death penalty defense are even more explicit: "Counsel must ... investigate prior convictions ... that could be used as aggravating circumstances or otherwise come into evidence. If a prior conviction is legally flawed, counsel should seek to have it set aside. Counsel may also find extenuating circumstances that can be offered to lessen the weight of a conviction." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7, comment. (Rev. Ed. 2003), reprinted in 31 Hofstra L. Rev. 913, 1028 (2003)(footnotes omitted).

Mr. Rompilla was convicted and sentenced to death in 1988, a little more than one year after Mr. Judge's conviction and sentence. See, e.g., Commonwealth v. Rompilla, 539 Pa. 499, 504, 653 A.2d 626, 628 (1995). Inasmuch as the above-referenced earlier ABA standard was issued in 1982, we find, a fortiori, that this is the same version that was applicable at the time of Petitioner's trial.

[22] We say "apparently" because there are 11 pages missing from the transcript of the sentencing portion of the trial in the record received from the state court. (See, N.T. 4/15/87, 53-64). Missing from this transcript is the entirety of Mrs. Judge's testimony and the initial portion of defense counsel's closing argument.

young daughter. (Consolidated Petition for Writ of Habeas Corpus, ¶248). Although there is nothing in the record from Petitioner's trial counsel attesting to what his strategy was or the extent of his investigation, we surmise from counsel's remark found on page 25 of the transcript from the day of the sentencing hearing that "I have spoken to my client about handling the preparation of his sentencing hearing. ...[a]nd I discussed that I would like to have his mother testify or put some witnesses on the stand to testify in his behalf," that he did no investigation into Petitioner's family background, medical, psychiatric, social or school history, or anything else either in advance of and/or in preparation for the sentencing portion of the trial. This inference is confirmed by the affidavits of Petitioner's mother, uncle, cousin, friend and former girlfriend that they were never contacted by Petitioner's attorney or any investigator or anyone else acting on his behalf prior to the trial nor were they, with the exception of Petitioner's mother, asked whether they would be willing to testify for him. (Exhibits "A" - "E," Appendix to Consolidated Petition for Writ of Habeas Corpus). According to Mrs. Judge, Mr. Priluker just told her at the courthouse shortly before she got on the stand that "he needed a character witness for Roger and that I was that witness." (Exhibit "A," ¶18).

As the affidavits from the foregoing people reflect, had they been contacted, they all would have testified to

Petitioner's almost life-long history of isolation and loneliness, moodiness, and irrational and peculiar behavior. His mother would also have attested to the difficulties which her son had in school from a young age, both academically and socially, and to the teasing and harassment he suffered as a result of his small stature. His former girlfriend (who is the mother of Petitioner's child), as well as his uncle, cousin and friend would all have been willing to testify to the over-bearing and controlling nature of Petitioner's mother and to the fact that she frequently criticized and belittled him, giving him no privacy and treating him like a young child even though he was a young adult. They also would have testified to Petitioner's odd nature, extreme immaturity and abnormal dependence on his mother and to the fact that he had no relationship with his biological father while his adoptive step-father, who drank heavily, took no interest in him and was not involved with his life. (Exhibits "B" - "E").

In addition, had defense counsel conducted any investigation whatsoever into his client's prior criminal history (the same criminal history which was testified to and used as an aggravator at sentencing), he would have uncovered that Petitioner had been previously psychiatrically evaluated several times at the behest of the Philadelphia County Court of Common Pleas' Probation Department and had been diagnosed with, *inter alia*, Schizhoid

Personality Disorder, Mixed Character Disorder with strong passive-aggressive features, Paranoid Personality Disorder and Anti-social Personality Disorder and that while he was competent to stand trial, his prognosis was poor. (Exhibit "H"). A request for Petitioner's school records would have resulted in the discovery that as early as age 10, Petitioner had a history of below-grade level performance despite his average intelligence and that he had difficulty with concentration and attention and suffered from strong feelings of inadequacy, anxiety, dependence, isolation and lack of acceptance. His mother's over-protective, over-critical nature was also noted as was his over-dependence on her and his lack of independence and confidence as a consequence. (Exhibits "I" and "J").

Also never contacted was Petitioner's prior court-appointed attorney, Carol Koller, Esquire, who as a member of the Philadelphia Defenders Association, represented Petitioner in 1982 for the bank-bag snatching for which he was subsequently convicted (the evidence of which was likewise introduced as an aggravating circumstance at the sentencing portion of the trial in this case). Had Ms. Koller been contacted, she would have told Mr. Priluker that she believed that Mr. Judge was a "Momma's boy" incapable of making his own decisions, and of the results of the pre-sentence and mental health reports which were generated as a result of Petitioner's conviction in that case. (Exhibit

"G").

It goes without saying that having failed to conduct any investigation, Petitioner's trial attorney also made no efforts to have Petitioner psychiatrically evaluated. Had he done so, he would have learned that as a result of his Schizotypal Personality Disorder, Petitioner's thought process is significantly disorganized, he is paranoid, he cannot make rational judgments without the assistance of others who are rational, and he has such a distorted view of reality that he can not appreciate the consequences of his behavior. (Affidavit of Julie Kessel, M.D., attached to Petitioner's Appendix to Consolidated Petition for Writ of Habeas Corpus as Exhibit "F").

As previously noted, in order to show prejudice warranting relief under Strickland, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Bond v. Beard, 539 F.3d 256, 289 (3d Cir. 2008)(quoting Strickland, 466 U.S. at 694, 104 S. Ct. 2052). In other words, "for there to be a different result in this case, one juror would have had to vote for life imprisonment rather than the death penalty." Id. (citing 42 Pa. C. S. A. §9711(c)(1)(iv)).

In answer to the instant claim, the Commonwealth asserts that Petitioner fails to make the necessary showing inasmuch as the jury in fact found as a mitigating circumstance that

"defendant was under the influence of extreme mental or emotional disturbance" in keeping with 42 Pa. C. S. A. §9711(e)(2). And, the Commonwealth further argues,

> had defense counsel presented a mental health expert at trial, "there is no question that" [it] "would have responded in kind," with the result that "the sentencing hearing would have become a 'battle of experts,' ... thereby jeopardizing the one mitigating circumstance that the jury did find. Instead, trial counsel avoided this potential standoff by relying on the facts of the case, _i.e._, arguing that the confrontation between petitioner and Christopher Outterbridge the night before the shootings had caused an extreme emotional disturbance in petitioner.
>
> To the extent that petitioner also supposes that the testimony of mental health experts such as Dr. Kessel would have caused the jury to assign greater weight to the extreme mental or emotional disturbance mitigator than it did find, he is plainly wrong. Faced with opposing mental health experts, the jury was just as likely to conclude that the mental health experts cancelled each other out.
>
> ...
>
> It must be presumed that if trial counsel had any reason to suspect that petitioner suffered from a mental impairment, he would have investigated such a possibility for mitigation.

(Commonwealth's Memorandum of Law in Opposition to Consolidated Petition for Writ of Habeas Corpus, pp. 97-98).

In so arguing, the Commonwealth is speculating as to what trial counsel's strategy may have been with respect to how he conducted the sentencing portion of the trial. While it would obviously be of tremendous benefit to hear what was in the mind of defendant's trial counsel as he determined how to handle the sentencing portion of the trial, in the end it is of little

consequence.  To be sure, the question with which we are now
faced is not whether Mr. Priluker may have had a valid strategic
reason to present the limited evidence which he did, it is
whether his decision to undertake no investigation at all was
reasonable.[23]  "In assessing the reasonableness of an attorney's
investigation, ... a court must consider not only the quantum of
evidence already known to counsel, but also whether the known
evidence would lead a reasonable attorney to investigate further.
Wiggins, 539 U.S. at 527, 123 S. Ct. at 2538.  Given the clearly
mitigating nature of Petitioner's mental health, family, school
and social history available in the court's files relating to the
previous convictions on which the Commonwealth was presenting
evidence as aggravating circumstances, and the evidence of
Petitioner's current mental illness as reflected in his trial
testimony, we simply cannot find any sound, strategic basis to
conduct no investigation at all, even affording trial counsel all
due deference.  Again, a "reasonable probability" is a
probability sufficient to undermine confidence in the outcome.
Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.  Inasmuch as
this Court's confidence in the outcome of the sentencing hearing
in this case has thereby been undermined, we find that Petitioner

---

[23]    It has otherwise been said that "'strategic choices made after less
than complete investigation are reasonable' only to the extent that
'reasonable professional judgments support the limitations on investigation.'"
Bond v. Beard, 539 F.3d at 286(quoting Wiggins v. Smith, 539 U.S. at 533, 123
S. Ct. 2527 and Strickland, 466 U.S. at 690-91, 104 S. Ct. 2052).

is entitled to a new penalty hearing for the reason that his Sixth Amendment right to the effective assistance of counsel has been violated by the failure to conduct a reasonable investigation.

   *5.  The Trial Court's Reasonable Doubt Instruction*

   Petitioner next asserts that the trial court's instruction concerning reasonable doubt which was given only at the guilt phase (and which thereby impacted the sentencing phases of the trial as well) was defective and effectively infringed upon his right to be presumed innocent in violation of his due process rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.  After careful review and consideration of the record in this matter, we cannot agree.

   Although a trial judge has "broad discretion in framing the form and language of the charge to the jury," in criminal cases, the Due Process Clause mandates that the Government must prove a defendant's guilt beyond a reasonable doubt.  United States v. Gardner, No. 10-3239, 429 Fed. Appx. 188, 190, 2011 U.S. App. LEXIS 11047 at *5 (3d Cir. May 31, 2011); Faulcon v. Palakovich, No. 04-CV-1738, 2004 U.S. Dist. LEXIS 20071 at *28 (E.D. Pa. Sept. 28, 2004)(quoting U.S. v. Traitz, 871 F.2d 368, 383 (3d Cir.), *cert. denied*, 493 U.S. 821, 110 S. Ct. 78, 107 L. Ed.2d 44 (1989)).  However, while the beyond a reasonable doubt standard is a requirement of due process, the Constitution neither

prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. Victor v. Nebraska, 511 U.S. 1, 5, 114 S. Ct. 1239, 1243, 127 L. Ed.2d 583 (1994). "Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." Id. (*internal citations omitted).* "Rather, 'taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury.'" Id., (quoting Holland v. United States, 348 U.S. 121, 140, 75 S. Ct. 127, 137, 99 L. Ed.2d 150 (1954)).

Accordingly, an instruction to a jury should not be 'judged in artificial isolation, but must be viewed in the context of the overall charge.'" Faulcon, 2004 U.S. Dist. LEXIS at *29 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 645, 94 S. Ct. 1868, 1872, 40 L. Ed.2d 431 (1974)). The proper task on review is to determine "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution" or, stated otherwise, "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet" the reasonable doubt standard." Estelle v. McGuire, 502 U.S. 62, 72, 112 S. Ct. 475, 482, 116 L. Ed.2d 385 (1991); Thomas v. Horn, 570

F.3d 105, 117 (3d Cir. 2009).

By his challenge, Petitioner specifically takes exception to the following language employed by the trial judge in his reasonable doubt instruction:

> A reasonable doubt is a doubt that would cause a reasonably careful and sensible person to restrain before acting upon a matter of importance in his own affairs. ...
> (N.T. 4/14/87).

> ...But I repeat that during your deliberations, in order to find the Defendant guilty of any class of criminal homicide encompassed in said general murder bill, you must first find that the Commonwealth has established by the evidence introduced or has proven each and every essential element of that class of criminal homicide beyond a reasonable doubt as I have previously defined and explained the meaning of that term for you. ...
> (N.T. 4/14/87, 126).

Indeed, it is Petitioner's position that the use of the word "restrain" instead of "hesitate" and the use of the word "or" between the phrases "you must first find that the Commonwealth has established by the evidence introduced" and "has proven each and every essential element of that class of criminal homicide beyond a reasonable doubt" had the effect of reducing the high burden of proof upon the Commonwealth.

According to MERRIAM WEBSTER's online Dictionary (www.Merriam-Webster.com), the word "hesitate" is variously defined to mean "to hold back in doubt or indecision," "to delay momentarily: pause," and to "stammer."  "Restrain," in turn, is said to be "to prevent from doing, exhibiting or expressing something," "to limit, restrict, or keep under control," "to

59

moderate or limit the force, effect, development, or full
exercise of," or "to deprive of liberty."   While it is true that
the U.S. Supreme Court has repeatedly approved instructions which
define reasonable doubt as "a doubt that would cause a reasonable
person to hesitate to act," it is likewise the case that "[t]he
Pennsylvania Supreme Court has a long history of approving and
recommending the "restrain from acting" formulation," with the
U.S. Supreme Court remaining silent on "whether the 'restrain
from acting' formulation is acceptable."   Victor, 511 U.S. at
20, 114 S. Ct. at 1250 (citing Holland, supra); Thomas, 570 F.3d
at 118 (citing, inter alia, Commonwealth v. Marshall, 570 Pa.
545, 810 A.2d 1211, 1225 (2002); Commonwealth v. Young, 456 Pa.
102, 317 A.2d 258, 261-62 (1974) and Commonwealth v. Donough, 377
Pa. 46, 103 A.2d 694, 697 (1954)).  Again, however, the charge
must be read in context in its entirety and in this case, the
charge stated the following in pertinent part:

> A Defendant is not required to present evidence or to prove
> anything in his own defense.  If the Commonwealth's evidence
> fails to meet its burden, then your verdict must be not
> guilty.  On the other hand, if the Commonwealth's evidence
> does prove beyond a reasonable doubt that the Defendant is
> guilty, then your verdict must be guilty.  Although the
> Commonwealth has the burden of proving that the Defendant is
> guilty, this does not mean that the Commonwealth must prove
> its case beyond all doubt and to a mathematical certainty.
> Nor must it demonstrate the complete impossibility of
> innocence.
>
> A reasonable doubt is a doubt that would cause a reasonably
> careful and sensible person to restrain before acting upon a
> matter of importance in his own affairs.  A reasonable doubt
> must fairly arise out of the evidence that was presented or

out of the lack of evidence presented with respect to some
element of the crime.  A reasonable doubt must be a real
doubt; it may not be an imagined one or a speculative one;
nor may it be a doubt manufactured to avoid carrying out an
unpleasant duty.

So to summarize, you may not find the Defendant guilty based
on a mere suspicion of guilt.  The Commonwealth has the
burden of proving the Defendant guilty beyond a reasonable
doubt as I have defined that term for you.  If it meets this
burden, then and only then must the Defendant be no longer
presumed innocent and you must find him guilty.  On the
other hand, if the Commonwealth does not meet its burden,
then you must find the Defendant not guilty.  (N.T. 4/14/87,
110-111).

Previously, we considered the Constitutionality of this very

same reasonable doubt instruction given by the very same trial

judge in the case of <u>Peterkin v.  Horn</u>, 176 F. Supp. 2d 342, 380

(E.D. Pa. 2001).  The Petitioner in that case raised this

identical issue as part of his Petition for Writ of Habeas Corpus

from his death penalty conviction in the Philadelphia County

Court of Common Pleas in September, 1982.  Given that we reach

the same conclusion with respect to the propriety of the

instruction given in Mr. Judge's case, we reiterate and re-affirm

our conclusion in <u>Peterkin</u>.  Again,

"we agree ... that the use of the word 'restrain' implies a
slightly higher level of doubt than does the word hesitate,'
[but] we do not find that the trial court's use of the word
'restrain' in its reasonable doubt instruction operated to
raise the level of doubt so high as to constitute
constitutional error. Rather, our review of the instruction
as a whole reveals that the trial court adequately defined
the meaning and outlined the proper implementation of the
concept of reasonable doubt to the jury."

176 F. Supp. 2d at 381.  *In accord*, <u>Thomas v. Horn</u>, <u>supra</u>;

Labrake v. Stowitzky, Civ. A. No. 07-212, 2009 U.S. Dist. LEXIS
80527 (E.D. Pa. Sept. 3, 2009); Faulcon v. Palakovich, supra).
For these reasons, this Petitioner's request for habeas relief on
the grounds that the reasonable doubt instruction was defective
in his case is likewise denied.

    *6.  Adequacy of Alibi Instruction*

    Petitioner further claims that his constitutional rights
under the Fifth, Sixth, Eighth and Fourteenth Amendments were
violated by virtue of the erroneous instruction given by the
trial court on alibi evidence.  More particularly, Mr. Judge
asserts that the court's instruction failed to inform the jury
that his alibi evidence, even if not wholly believed, could
create a reasonable doubt.  "This error, standing alone and in
combination with the court's further errors in instructing the
jury on reasonable doubt, unlawfully shifted the burden of proof
to Petitioner and undermined the reliability of the resulting
verdict."  (Consolidated Petition for Writ of Habeas Corpus,
¶320, p. 151).

    It is of course true that in a criminal trial, the State
must prove every element of the offense(s) charged, and a jury
instruction violates due process if it fails to give effect to
that requirement.  Middleton v. McNeil, 541 U.S. 433, 437, 124 S.
Ct. 1830, 1832, 158 L. Ed.2d 701, 707 (2004)(citing Sandstrom v.
Montana, 442 U.S. 510, 520-21, 99 S. Ct. 2450, 61 L. Ed.2d 39

(1979)). "Nonetheless not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Id. "Rather, the defendant must show that the instruction was ambiguous and that there was 'a reasonable likelihood' that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." Waddington v. Sarausad, 555 U.S. 179, 126 S. Ct. 823, 831, 172 L. Ed.2d 532 (2009)(quoting Estelle v. McGuire, supra, 502 U.S. at 72, 112 S. Ct. 475 and Boyde v. California, 494 U.S. 370, 380, 110 S. Ct. 1190, 108 L. Ed.2d 316 (1990)). "Satisfaction of this two-part inquiry requires a federal habeas court to 'focus initially on the specific language challenged,' and then to review the challenged instruction in the context of the entire charge and in light of the evidence and arguments presented at trial." Williams v. Beard, supra, 637 F.3d at 223 (quoting Smith v. Horn, 120 F.3d 400, 411 (3d Cir. 1997)). See also, Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S. Ct. 396, 400, 38 L. Ed.2d 368 (1973)("[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.")

"In this fashion, a due process analysis depends as much on the language of the court's charge as it does on the particularities of a given case." Williams, id. "In other

words, the inquiry requires careful consideration of each trial's unique facts, the narratives presented by the parties, the arguments counsel delivered to the jurors before they retired to deliberate and the charge as a whole." Id. (citing Waddington, 555 U.S. 179, 129 S. Ct. at 831-33; Estelle, 502 U.S. at 72, 112 S. Ct. 475). And, "[b]ecause it is not enough that there is some 'slight possibility' that the jury misapplied the instruction, ... the pertinent question 'is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Waddington, 129 S. Ct. at 832 (citing Weeks v. Angelone, 528 U.S. 225, 236, 120 S. Ct. 727, 145 L. Ed.2d 727 (2000); Estelle, and Cupp, both supra).

In this case, the challenged portion of the charge is found on pages 117 and 118 of the Notes of Testimony dated April 14, 1987 and reads as follows:

> Obviously, the Defendant cannot be guilty unless he was at the scene of the alleged crime. The Defendant has testified that he was not present at the crime but rather was on his way to Roxborough with other individuals. You should consider this evidence along with all the other evidence in the case in determining whether the Commonwealth has met its burden of proof beyond a reasonable doubt that a crime was committed and that the Defendant himself committed it. The Defendant's evidence that he was not present, either by itself or together with other evidence, may be sufficient to raise a reasonable doubt of his guilt in your mind. If you have a reasonable doubt of the Defendant's guilt, you must find him not guilty. On the other hand, if you do not have a reasonable doubt of the Defendant's guilt, then you should find him guilty.

Specifically, Petitioner contends that this instruction was

defective because it failed to inform the jury that alibi evidence, *even if not wholly believed* can operate to raise a reasonable doubt, relying on <u>Commonwealth v. Pounds</u>, 490 Pa. 621, 417 A.2d 597 (1980). In that case, the defendant alone had testified that, at the time of the murder for which he was ultimately convicted, he was asleep in his car parked outside a friend's home and that after he was awakened in the early morning hours, he moved from his car to sit on the front porch of the home. The Pennsylvania Supreme Court agreed that this "testimony was sufficient to raise an alibi defense and entitled him to an alibi instruction as he requested." <u>Id</u>, 490 Pa. at 632-633, 417 A.2d at 602-603. Although the trial court instructed the jury generally on, *inter alia*, the presumption of Defendant Pounds' innocence, the Commonwealth's burden of proof of all elements of the crime beyond a reasonable doubt, that Defendant had no burden to prove himself innocent and the obligation of the jury to weigh the credibility of the testimony presented, it "failed to instruct the jury that it should acquit if Pounds' alibi evidence, even if not wholly believed, raised a reasonable doubt of his presence at the scene of the crime at the time of its commission, and thus, of his guilt." <u>Id</u>. Noting as to the "if not wholly believed" language, that "[t]his is so because the

Defendant bears no burden of proof on alibi,"[24] the Pennsylvania

Supreme Court granted Defendant a new trial, and held:

> Where an alibi defense is presented, such an [alibi]
> instruction is necessary due to the danger that the failure
> to prove the defense will be taken by the jury as a sign of
> the defendant's guilt. General instructions on the
> Commonwealth's burden of proving each element of the offense
> beyond a reasonable doubt, the absence of a burden of proof
> on the defendant, and assessing the credibility of
> witnesses do not adequately protect against this danger.
> (Citations omitted) Furthermore, by refusing to give the
> requested instruction, the trial court, in effect, deprived
> Pounds of a substantive defense. Thus, the trial court
> erred in refusing to instruct on alibi.

Pounds, 490 Pa. at 633-634.

We disagree with Petitioner's interpretation of Pounds.

Rather, we find that Pounds stands only for the proposition that

where a trial court is faced with alibi evidence, it is obligated

to give an alibi instruction and that the failure of trial

counsel to request and/or fail to object to a trial court's

refusal to so instruct renders that counsel ineffective. See,

e.g., Commonwealth v. Hawkins, 586 Pa. 366, 894 A.2d 716, 717-718

(2006); Commonwealth v. Allison, 424 Pa. Super. 341, 622 A.2d

950, 952 (1993). Indeed, it has repeatedly been held that a

proper alibi instruction need not contain any "magic language."

Instead, what is required is that the charge make clear to the

jury that alibi evidence, by itself or taken together with other

---

[24] See, footnote 16, 490 Pa. at 633, citing Commonwealth v. Bonomo, 392
Pa. 222, 151 A.2d 441 (1959); Commonwealth v. Van Wright, 249 Pa. Super. 451,
378 A.2d 382 (1977); Pennsylvania Standard Jury Instructions, Criminal, §3.11.

evidence may tend to raise a reasonable doubt as to a defendant's guilt. _Allison_, 622 A.2d at 953. Moreover, the Pennsylvania Supreme Court has expressly rejected Petitioner's contention that the exact "even if not wholly believed" language referenced in _Pounds_ must be "parroted" to pass appellate review. See, _Commonwealth v. Begley_, 566 Pa. 239, 278-279, 780 A.2d 605, 629 (2001); _Commonwealth v. Ragan_, 560 Pa. 106, 743 A.2d 390, 399 (1999); _Commonwealth v. Saunders_, 529 Pa. 140, 145, 602 A.2d 813, 818 (1992). So long as the alibi instruction, when taken as a whole, "makes it clear to the jury that a defendant's failure to prove the alibi is not in and of itself a basis for a finding of guilt, the instruction cannot be faulted for failing to parrot the exact language in _Pounds_." _Ragan_, _supra_, (quoting _Saunders_, _supra_, and citing _Commonwealth v. Thomas_, 552 Pa. 621, 717 A.2d 468, 478-479 (1998), _cert. denied_, ___ U.S. ___, 120 S. Ct. 78, 145 L. Ed.2d 66 (1999)).

We note further, that in _Ragan_, _Saunders_, and _Begley_, all _supra_, the Pennsylvania Supreme Court specifically approved the alibi charges given to the juries in each of those cases. Those charges, like the one in the case at bar, essentially mirror the language in the Pennsylvania Standard Criminal Jury Instruction §3.11[25], which reads as follows:

---

[25] We note that there has been no change in the text of §3.11 since Petitioner's trial in 1987.

> In this case, the defendant has presented evidence of an
> alibi, that is, that [he][she] was not present at the scene
> or was rather at another location at the precise time that
> the crime took place.  You should consider this evidence
> along with all the other evidence in the case in determining
> whether the Commonwealth has met its burden of proving
> beyond reasonable doubt that a crime was committed and that
> the defendant [himself][herself] committed [or took part in
> committing] it.  The defendant's evidence that [he][she] was
> not present, either by itself or together with other
> evidence, may be sufficient to raise a reasonable doubt of
> [his][her] guilt.  If you have a reasonable doubt of the
> defendant's guilt, you must find [him][her] not guilty.

Inasmuch as the alibi charge given to Petitioner's jury clearly

comported in all respects with Pennsylvania law both now and at

the time of his trial, we find no error and no ineffective

assistance of counsel for failing to object to the charge as

given.  We likewise discern no ambiguity in the alibi instruction

given, particularly in light of the overall charge nor do we find

it likely that the jury applied the instruction in such a manner

as to have relieved the Commonwealth of its burden of proving

every element of the crime beyond a reasonable doubt.   As a

consequence, Petitioner's request for habeas relief on the

grounds that the alibi charge given to his jury violated his

Fifth, Sixth, Eighth and Fourteenth Amendment rights is denied.

*7.  Failure of Pennsylvania Supreme Court's Proportionality
Review to Comport with 42 Pa. C. S. §9711(h)(3(iii) and the
Eighth and Fourteenth Amendments*

Petitioner next avers that he should be granted habeas

relief because the proportionality review which the Pennsylvania

Supreme Court was required to conduct at the time of his trial

was not "meaningful."[26]  According to Petitioner, the

proportionality review provision in the state statute created a

vested right equating to a federal due process liberty interest

and thus this inadequate proportionality review resulted in a

denial of his federal constitutional rights to due process.

Historically, "proportionality review was considered to be

_____

[26]  Specifically, under 42 Pa. C. S. A. §9711(h), the prescribed
sentencing procedure for first degree murder cases in Pennsylvania requires
automatic review of all death sentences by the Pennsylvania Supreme Court and
provides the following in relevant part:

(1) A sentence of death shall be subject to automatic review by the
Supreme Court of Pennsylvania pursuant to its rules.

(2) In addition to its authority to correct errors at trial, the Supreme
Court shall either affirm the sentence of death or vacate the sentence
of death and remand for further proceedings as provided in paragraph
(4).

(3) The Supreme Court shall affirm the sentence of death unless it
determines that:

(i) the sentence of death was the product of passion, prejudice or
any other arbitrary factor; or

(ii) the evidence fails to support the finding of at least one
aggravating circumstance specified in subsection (d).

(4) If the Supreme Court determines that the death penalty must be
vacated because none of the aggravating circumstances are supported by
sufficient evidence, then it shall remand for the imposition of a life
imprisonment sentence.  If the Supreme Court determines that the death
penalty must be vacated for any other reason, it shall remand for a new
sentencing hearing pursuant to subsections (a) through (g).

At the time that Petitioner was tried in April, 1987 and until 1997,
subsection (h)(3) also included:

(iii) the sentence of death is excessive or disproportionate to
the penalty imposed in similar cases, considering both the
circumstances of the crime and the character and record of the
defendant.

This provision was repealed by Act 1997, No. 28, which also deleted the
verbiage: "or because the sentence of death is disproportionate to the penalty
imposed in similar cases" following "sufficient evidence" from subsection
(h)(4).

an additional safeguard against arbitrarily imposed death sentences." Pulley v. Harris, 465 U.S. 37, 50, 104 S. Ct. 871, 879, 79 L. Ed.2d 29 (1984). However, in contradiction of Petitioner's argument, while proportionality review is certainly admirable and perhaps even desirable, state appellate courts are *not* constitutionally required to conduct such review in capital cases under the Eighth and Fourteenth Amendments. Id., 465 U.S. at 43-44, 104 S. Ct. at 876; Wharton v. Vaughan, Civ. A. No. 01-CV-6049, 2012 U.S. Dist. LEXIS 115598 at *253-*254 (E.D. Pa. Aug. 16, 2012). Further, "it is not the province of a federal habeas court to re-examine state -court determinations on state court questions" and "federal habeas corpus relief does not lie for errors of state law." Estelle v. McGuire, supra, 502 U.S. at 67-68, 112 S. Ct. at 480 (quoting Lewis v. Jeffers, 497 U.S. 764, 780, 110 S. Ct. 3092, 3102, 111 L. Ed.2d 606 (1990)).

Moreover, "it is unclear whether, under Third Circuit law, a state proportionality-review statute creates any cognizable liberty interest for due process purposes." Riley v. Taylor, 277 F.3d 261, 311 (3d Cir. 2001)(citing Frey v. Fulcomer, 132 F.3d 916, 925, n.7 (3d Cir. 1997)); Wharton, supra, at 254. Thus, in evaluating a claim that a state court erred in conducting its proportionality review, a federal court may inquire only into whether the state court "undertook its proportionality review in good faith and found that the defendant's sentence was

70

proportional to the sentences imposed in cases similar to his."
Riley, supra, (quoting Walton v. Arizona, 497 U.S. 639, 656, 110
S. Ct. 2428, 3047, 111 L. Ed.2d 511 (1990), *rev'd on other
grounds*, Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428, 153 L.
Ed.2d 556 (2002)). "Because there is no federal constitutional
right to proportionality review, if the federal court finds that
the review was undertaken in good faith, it cannot 'look behind'
the state court's conclusion of proportionality to consider
whether the state court misapplied state proportionality law."
Riley, 277 F. 3d at 311-312; Stevens v. Beard, 701 F. Supp.2d
671, 706-707 (W.D. Pa. 2010).

In application of the foregoing, in the Opinion which it
issued on May 18, 1992, the Pennsylvania Supreme Court, after
having ordered, *sua sponte*, that its review of Petitioner's
capital case would be "limited to statutory review pursuant to 42
Pa. C.S.A. §9711(h) and the review of the sufficiency of the
evidence as required in Commonwealth v. Zettlemoyer, 500 Pa. 16,
454 A.2d 937 (1982), cert. denied, 461 U.S. 970, 103 S. Ct. 2444,
77 L. Ed.2d 1327, reh'g denied, 463 U.S. 1236, 104 S. Ct. 31, 77
L. Ed.2d 1452..." declared the following with regard to the
proportionality of Petitioner's sentence of death:

> The circumstances of this crime and the record of this
> appellant justify our conclusion that the sentences of death
> imposed upon appellant are neither excessive nor
> disproportionate to the penalty imposed in similar
> cases...(based upon information accumulated by the
> Pennsylvania Death Penalty Study and supplied by the

Administrative Office of Pennsylvania Courts.)  See,
Commonwealth v. Frey, 504 Pa. 428, 475 A.2d 700 (1984),
cert. denied, 469 U.S. 963, 105 S. Ct. 360, 83 L. Ed.2d 296
(1984)(and Appendix attached thereto). ...

Commonwealth v. Judge, 530 Pa. 403, 406, n.4, 415, 609 A.2d 785,

786, n.4, 791 (1992).

Petitioner here seeks to distinguish his case from Riley by

pointing out the defects in the structure of the proportionality

review database along with what he alleges are numerous data

collection and data coding errors that rendered it impossible for

the Pennsylvania Supreme Court to perform a meaningful review.

This is essentially the same argument advanced by the petitioners

in Kindler and Wharton, both supra.  As in Wharton, Mr. Judge

looks to a Declaration from a professor of sociology and

statistics at Temple University who examined the information

contained in the AOPC proportionality database and the testimony

of the AOPC's chief counsel in the unrelated case of Commonwealth

v. Terry.  In this Declaration, the professor concludes that

because the AOPC database collects and records only the

mitigating circumstances presented in Pennsylvania capital cases

rather than the mitigating circumstances found in those cases,

fails to record information in cases in which a life, rather than

a death sentence is imposed or where a jury is hung, and fails to

take account of those cases in which a guilty plea results in a

life sentence, the database "statistically skews toward death the

outcome of any proportionality review based upon a comparison

72

from which these cases are omitted."  As we opined in <u>Kindler</u>, "[w]hile Petitioner may well be correct in his assertion that the AOPC database was flawed and the system for conducting proportionality review in Pennsylvania was less than perfect, we nevertheless cannot find any requirement that such review be flawlessly conducted, even assuming that it gives rise to a liberty interest."  Here, as there, we discern "no evidence or argument to suggest that the Supreme Court conducted its review in bad faith."  <u>See</u>, <u>Kindler</u>, 291 F. Supp. 2d at 353.  And, as Judge Goldberg observed in <u>Wharton</u> in rejecting the claim that a "proportionality review grounded in an identifiably flawed database which the court has consistently refused to correct is a review done in bad faith," ... "there is no indication in Petitioner's submission, however, that the alleged errors in the database were called to the Supreme Court's attention at the time it performed its proportionality review of Petitioner's case in 1995."  These analyses apply with equal force here – there is no evidence suggesting that the Pennsylvania Supreme Court was aware of the alleged flaws in the AOPC database when it conducted its review in this petitioner's case in 1992, nor have we been presented with any authority requiring perfection in performance of a proportionality review.  Accordingly, we cannot find that the proportionality review in Mr. Judge's case was performed in bad faith and hence we also will not "look behind" the Supreme

Court's conclusion that the sentence imposed on Mr. Judge was neither excessive nor disproportionate to that rendered on other defendants in similar cases. Petitioner's application for relief from his death sentence on this ground is therefore denied.

*8. Petitioner's Death Sentence was a Consequence of Improper Racial Discrimination*

Petitioner further seeks habeas relief from his death sentence for the reason that it was a product of improper racial discrimination in violation of the Pennsylvania and United States Constitutions and the Pennsylvania Capital Sentencing Statute itself. In support of this argument, Petitioner reiterates much of his previous argument *vis-a-vis* Batson,[27] but also relies in large measure on the first stage of a statistical analysis and study into systemic race effects in prosecutorial and jury decision making in Philadelphia during the period 1983-1993. This study was conducted by David Baldus, a Professor of Law at the University of Iowa College of Law and George Woodworth, a Professor of Statistics and Actuarial Science at the University of Iowa. According to Petitioner, this study demonstrates that racial discrimination in the administration of capital punishment in Philadelphia permeated his trial, resulting in a death sentence imposed in violation of the Sixth, Eighth and Fourteenth

---

[27] Inasmuch as we have already addressed Petitioner's arguments with respect to his Batson claim and his contentions regarding the McMahon training video, we see no need to regurgitate them here. Instead, that portion of this Memorandum Opinion is incorporated herein by reference.

Amendments.

In addressing this argument, we turn first to Dr. Baldus'
Affidavit/Declaration, attached as Exhibit "N,"to the Appendix to
Petitioner's Consolidated Petition for Writ of Habeas Corpus,
wherein he summarizes his findings as follows:

> 4.  Overall, the odds of African-American defendants
> receiving a death sentence are, in a jury penalty trial, on
> average, higher by a factor of 4.8.  There are statistically
> significant race effects at the two key decisionmaking
> stages in the capital sentencing process outlined in Figure
> 1 - levels 5 and 6.  At level 6, Black defendants are much
> more likely to receive the death penalty than other
> similarly situated defendants where juries weigh aggravating
> and mitigating circumstances.  At this stage, the odds of
> the average African-American defendant receiving the death
> penalty are greater by a factor of 14.6, controlling for the
> culpability of the defendants.

> 5.  There is also a race effect at stage 5, where defendants
> are sentenced to death after the jury fails to find any
> mitigating evidence.  At this stage in the process, the odds
> that a person convicted of killing a non-Black person will
> be sentenced to death are, on average, approximately 4.3
> times greater than those for a defendant convicted of
> killing a Black person, after controlling for the
> defendant's culpability.

> 6.  In effect, both the Black race of the defendant and the
> non-Black race of the victim serve as additional aggravating
> circumstances and are more significant than many of the
> statutory aggravating circumstances in determining whether a
> death sentence will be imposed.

> 7.  Comparable race effects were estimated in statistical
> analyses that applied additional multivariate techniques for
> controlling for the culpability of the defendants involved
> in the analysis.

> 8.  Our analyses document some race of defendant effects in
> prosecutorial decision-making that disfavored African-
> American defendants.

> 9.  Our analyses also indicates that the Philadelphia

District Attorney's Office utilizes peremptory strikes to remove African-American jurors at a much higher rate than it strikes other jurors, and that it is more likely to strike white jurors from integrated neighborhoods than white jurors from highly segregated neighborhoods.

10.  Additionally, our data indicate that the lower the proportion of African-Americans on the jury, the greater the race effects. For example, juries with fewer African-Americans are more likely to treat African-American defendants less favorably than other similarly-situated defendants.

Dr. Baldus and Dr. Woodward have evidently conducted a number of studies of the death penalty schemes in a number of states with similar results.  In at least two other cases in this district before Judge Fullam and Judge Baylson for example, the death penalty habeas petitioners proffered the Baldus/Woodward statistical studies in support of their arguments that their death sentences were constitutionally unsound because they were the products of improper racial discrimination.  Both Judges Fullam and Baylson squarely rejected these arguments for the reason that, as was held by the U.S. Supreme Court in McCleskey v. Kemp, 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed.2d 262 (1987), the statistical evidence failed to prove the threshold issue – that the decisionmakers in each defendant's own case acted with a discriminatory purpose.  Williams v. Beard, Civ. A. No. 05-3486, 2007 U.S. Dist. LEXIS 41310 at *158-*159 (E.D. Pa. May 9, 2007)(Baylson, J.); Bond v. Beard, Civ. A. No. 02-8592, 2005 U.S. Dist. LEXIS 31574, at *3 (E.D. Pa. Dec. 7, 2005)(Fullam, J.).

As concluded by our brethren, we too find McCleskey v. Kemp

to be on all fours with and therefore determinative of the issue

now before us in this case.  The petitioner in <u>McCleskey</u> had been

convicted of capital murder in the state of Georgia and sentenced

to death pursuant to a sentencing scheme very much like

Pennsylvania's.[28]  As is the case here, in support of his habeas

petition, McCleskey "proffered a statistical study performed by

Professors David C. Baldus, Charles Pulaski, and George

Woodworth, ... that purports to show a disparity in the

imposition of the death sentence in Georgia based on the race of

the murder victim and, to a lesser extent, the race of the

defendant."[29]  After careful examination and analysis, the Supreme

---

[28]  Indeed, under Georgia law at the time of McCleskey's trial in 1978,
a separate penalty hearing was held subsequent to the trial on the defendant's
guilt or innocence, at which time the jury heard arguments as to the
appropriate sentence and considered evidence on aggravating and mitigating
factors.  The jury could not consider imposing the death penalty unless it
found beyond a reasonable doubt that the murder was accompanied by one of the
statutory aggravating circumstances and, in making its sentencing decision,
the jury considered the mitigating and aggravating circumstances of
McCleskey's conduct.  <u>Id</u>, 481 U.S. at 284, 107 S. Ct. at 1762-1763, notes 1-3,
(citing, <i>inter alia</i>, Georgia Code Ann. §§17-10-2(c), 17-10-30(b)).

[29]  The Supreme Court further observed:

The Baldus study is actually two sophisticated statistical studies that
examine over 2,000 murder cases that occurred in Georgia during the
1970's.  The raw numbers collected by Professor Baldus indicate that
defendants charged with killing white persons received the death penalty
in 11% of the cases, but defendants charged with killing blacks received
the death penalty in only 1% of the cases.  The raw numbers also
indicate a reverse racial disparity according to the race of the
defendant: 4% of the black defendants received the death penalty, as
opposed to 7% of the white defendants.

Baldus also divided the cases according to the combination of the race
of the defendant and the race of the victim.  He found that the death
penalty was assessed in 22% of the cases involving black defendants and
white victims; 8% of the cases involving white defendants and white
victims; 1% of the cases involving black defendants and black victims;
and 3% of the cases involving white defendants and black victims.
Similarly, Baldus found that prosecutors sought the death penalty in 70%

Court determined that the Baldus study did not of and by itself

prove the unconstitutionality of McCleskey's capital sentence

under the Eighth and/or the Fourteenth Amendment.  This is

largely because of the uniqueness of each and every jury and

each individual capital defendant, as well as the discretion

inherent in and essential to the criminal justice process. ("Each

jury is unique in its composition, and the Constitution requires

that its decision rest on consideration of innumerable factors

that vary according to the characteristics of the individual

defendant and the facts of the particular capital offense."

McCleskey, 481 U.S. at 294, 107 S. Ct. at 1768, citing Hitchcock

v. Dugger, 481 U.S. 393, 398-99, 107 S. Ct. 1821, 1824, 95 L.

Ed.2d 347 (1987) and Lockett v. Ohio, 438 U.S. 586, 602-605, 98

S. Ct. 2954, 2963-65, 57 L. Ed.2d 973 (1978)) ... "Implementation

of these [criminal laws against murder] necessarily requires

discretionary judgments [and] because discretion is essential to

---

of the cases involving black defendants and white victims; 32% of the
cases involving white defendants and white victims; 15% of the cases
involving black defendants and black victims; and 19% of the cases
involving white defendants and black victims.

Baldus subjected his data to an extensive analysis, taking account of
230 variables that could have explained the disparities on nonracial
grounds.  One of his models concludes that, even after taking account of
39 nonracial variables, defendants charged with killing white victims
were 4.3 times as likely to receive a death sentence as defendants
charged with killing blacks.  According to this model, black defendants
were 1.1 times as likely to receive a death sentence as other
defendants.  Thus, the Baldus study indicates that black defendants,
such as McCleskey, who kill white victims have the greatest likelihood
of receiving the death penalty.

Id, 481 U.S. at 286-287, 107 S. Ct. at 1764.

the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused." Id, 481 U.S. at 297, 107 S. Ct. at 1770). Thus, the McCleskey Court reasoned, "[f]or this claim to prevail, McCleskey would have to prove that the Georgia Legislature enacted or maintained the death penalty statute *because of* an anticipated racially discriminatory effect. As legislatures necessarily have wide discretion in the choice of criminal laws and penalties, and as there were legitimate reasons for the Georgia legislature to adopt and maintain capital punishment, we will not infer a discriminatory purpose on the part of the State of Georgia." Id.

This rationale applies with equal force here. Indeed, while the Baldus study helpfully points out the flaws that can and do result from the administration and application of Pennsylvania's death penalty statute in the City and County of Philadelphia, it is axiomatic that no system is perfect nor is perfection required to pass constitutional muster. As the various concurring and dissenting opinions of Furman v. Georgia, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed.2d 346 (1972) suggest, to pass constitutional muster, a state's death sentencing scheme must contain appropriate non-discriminatory and non-arbitrary parameters to guide a capital judge or jury in determining the propriety of imposing the ultimate penalty in a given case, "so as to minimize the risk of wholly arbitrary and capricious action." Gregg v.

<u>Georgia</u>, 428 U.S. 153, 189, 96 S. Ct. 2909, 2932, 49 L. Ed.2d 859(1976).  It is only in the absence of such parameters in the sentencing scheme that the death penalty is, on its face, unconstitutional.  Pennsylvania's capital statute has been found to possess such safeguards and its constitutionality has been upheld.  <u>See</u>, <u>Blystone v. Pennsylvania</u>, 494 U.S. 299, 110 S. Ct. 1078, 108 L. Ed.2d 255 (1990); <u>Zettlemoyer v. Fulcomer</u>, 923 F.2d 284, 291 (3d Cir. 1991).  Inasmuch as there is no evidence that the Pennsylvania death penalty statute was enacted with the intent to unlawfully discriminate against African-American defendants in particular, and as the Baldus-Woodward study fails to demonstrate that the decisionmakers in this petitioner's case acted with a discriminatory purpose, we decline to grant the writ on this basis.  To the extent and in the event that Mr. Long's explanation of why he struck the various known African-American and female potential jurors should reveal evidence of a racially discriminatory purpose in this case, we hereby indicate our willingness to consider supplemental briefing on this issue following the brief, evidentiary hearing granted with respect to Mr. Judge's <u>Batson</u> claim.

> *9.  Canada's violation of Petitioner's rights under the International Covenant for Civil and Political Rights ("ICCPR")*

Next, Petitioner invokes international law to support his contention that the writ should issue because Canada unlawfully

deported him back to the U.S. in disregard of the International
Covenant for Civil and Political Rights' ("ICCPR") prohibition of
the death penalty.  Insofar as Petitioner has not briefed this
issue, it would appear that he is no longer pursuing it.
Nevertheless, in the event that the claim should be found to
still be viable on appellate review and in the interest of
judicial economy, we shall briefly consider it here.  Unlike
Petitioner's other claims, however, we note that since the merits
of this claim were considered and addressed on PCRA by the
Pennsylvania Supreme Court, we apply the deferential standard
dictated by AEDPA.[30]

Specifically, on October 10, 2003, Mr. Judge filed a
Petition for Habeas Corpus/relief under the Pennsylvania Post
Conviction Relief Act in the Philadelphia County Court of Common
Pleas contending that since his deportation from Canada had been
found by the U.N. Human Rights Committee to have violated the
ICCPR, his death sentence should be either commuted to one for
life imprisonment or he should be returned to Canada for
deportation or extradition in accordance with the Committee's

---

[30] According to Petitioner, the instant claim was unavailable to him
until the United Nations Human Rights Committee issued a ruling on the
complaint which he filed with it against Canada under the First Optional
Protocol on August 7, 1998.  As noted above, that decision did not issue until
August 13, 2003 - some five years after its initial filing and nearly one year
after Petitioner filed his Consolidated Petition for Writ of Habeas Corpus in
this Court.

ruling.[31]  In an Opinion dated May 12, 2005, the Philadelphia

County Court of Common Pleas determined that, because the

identical claim had been raised in Petitioner's federal *Habeas*

*Corpus* petition, it need not address the claim, and it therefore

dismissed the PCRA application.  On direct appeal, however, the

Pennsylvania Supreme Court did consider the Petitioner's

international law argument on the merits[32], but affirmed the

dismissal of his PCRA/Habeas application on the ground that there

was nothing in the ICCPR itself or in the decisions of the Human

Rights Committee which authorized the Pennsylvania state courts

to enforce the international treaties involved or which mandated

the Pennsylvania courts to provide a remedy for Canada's

violations.  Commonwealth v. Judge, 591 Pa. 126, 916 A.2d 511,

526 (2007).[33]

    Again, 28 U.S.C. §2254 provides, in relevant part:

_____

[31] After Petitioner filed his PCRA petition with the state court, we
stayed this federal habeas matter to allow him to exhaust this claim in the
Pennsylvania court system.  It was in the interim, on April 16, 2004, that
Petitioner filed his Motion for Leave to Amend his Petition for Writ of Habeas
Corpus raising the same ICCPR claim in this action, which motion was granted
on May 21, 2004.

[32]  The state Supreme Court held that the Philadelphia County Court of
Common Pleas erred in dismissing Petitioner's claim on the basis of the
pending federal habeas petition based on its earlier holding in Commonwealth
v. Wharton, 575 Pa. 166, 835 A.2d 1273 (2003)(per curiam) that pending federal
proceedings do not justify the dismissal of a petition under the PCRA.  Judge,
916 A.2d at 517, n. 11.

[33]  Some seven months later, on November 7, 2007, the United States
Supreme Court denied Petitioner's application for writ of *certiorari* (see,
Judge v. Pennsylvania, ___ U.S. ___, 128 S. Ct. 533, 169 L. Ed. 2d 374 (2007))
and we then lifted our stay over these proceedings.

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding

Here, inasmuch as we can find no Supreme Court precedent on the matter now before us, we obviously cannot find that the Pennsylvania Supreme Court's decision "was contrary to, or involved an unreasonable application of clearly established Federal law." Nor do we find that the state Supreme Court's decision resulted from an unreasonable determination of the facts in light of the evidence before it. In fact, we find that the Pennsylvania Supreme Court's determination was analytically sound given that when the United States signed onto the ICCPR, it specifically reserved its right, "subject to its Constitutional constraints, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment, including such punishment for crimes committed by persons below eighteen

years of age."[34]    Furthermore, as noted in the Pennsylvania

Supreme Court's opinion, the United States further declared that

since the provisions of the ICCPR were not self-executing, those

provisions would require further Congressional action to be

enforceable within the United States.  <u>Judge</u>, 916 A. 2d at 515

(citing *138 CONG. REC.* S4781, s4783; RESTATEMENT (THIRD) FOREIGN

RELATIONS LAW OF THE UNITED STATES, §111(3) & (4), cmt. h

(1987)).  In the absence of any showing that Congress has at any

time undertaken this necessary action or that the United States

government has since abrogated its stated reservations to the

ICCPR, we therefore find the Pennsylvania state Supreme Court's

determination to be a reasonable one which we cannot overturn.

We thus decline to grant the writ of habeas corpus on the basis

of the ICCPR.

   *10. Cumulative Prejudicial Effect of the Errors*

   Finally, Petitioner claims entitlement to habeas relief for

the reason that the cumulative effect of all of the alleged

errors in his case resulted in the violation of his

constitutional rights.  Given our findings as discussed above and

in our Memorandum Opinion of March 13, 2009 granting Petitioner

habeas relief, we see no need to reach this issue.

---

[34]    As noted by the Pennsylvania Supreme Court, in <u>Roper v. Simmons</u>, 543
U.S. 551, 568, 125 S. Ct. 1183, 1194, 161 L. Ed.2d 1 (2005), the U.S. Supreme
Court determined that capital punishment for minors violates the Eighth
Amendment.  <u>See</u>, <u>Commonwealth v. Judge</u>, 916 A.2d at 515, n.5.

## **Conclusion**

For all of the reasons set forth above, the Consolidated Petition for Writ of Habeas Corpus is granted in part and denied in part.  The writ shall issue and relief is further granted to Petitioner as to the sentencing portion of his trial on Claims 3 and 4.  A brief evidentiary hearing shall be held for the sole purpose of obtaining evidence from the Prosecutor and Petitioner's trial attorney as to the prosecution's exercise of its peremptory strikes of those known African-American and female potential jurors discussed above.

An order follows.