**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ROGER JUDGE                      :
                                 :
        Petitioner               :   CIVIL ACTION
                                 :
     vs.                         :
                                 :
JEFFREY BEARD, Commissioner,     :
Pennsylvania Department of       :
Corrections, WILLIAM STICKMAN,:      NO. 02-CV-6798
Superintendent of the State      :
Correctional Institution at      :
Greene, ROBERT W. MEYERS,        :
Superintendent of the State      :
Correctional Institution at      :
Rockview, and MICHAEL FISHER,    :
Attorney General of the          :
Commonwealth of Pennsylvania     :
                                 :
            Respondents           :

<u>**MEMORANDUM AND ORDER**</u>

**JOYNER, J.**                                    **January 29, 2015**

　　This habeas corpus matter is again before the Court for resolution of one remaining issue: whether the exercise of the prosecutor's peremptory challenges during voir dire violated Petitioner's rights to equal protection and to a fair and impartial jury.  Previously, in our Memorandum Opinions of March 13, 2009 and November 28, 2012, we had granted Petitioner relief from his death sentence on the bases of <u>Mills v. Maryland</u>, 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988) and because his trial counsel was ineffective in failing to: (1) object to

the trial court's jury instruction on the definition of life imprisonment and (2) conduct any investigation at all in preparation for the sentencing portion of the trial.  Because we found that numerous questions remained with regard to why the prosecutor peremptorily struck several jurors of African-American and unknown ethnicity, we afforded Petitioner the opportunity to take additional evidence in order to determine whether there had been a violation of his rights as articulated in Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). Following the taking of supplemental evidence from Petitioner's trial attorney and the former Philadelphia Assistant District Attorney who prosecuted Petitioner in a series of evidentiary hearings held on June 20, 2013, October 15, 2013 and March 4, 2014 and submission by the parties of additional briefing, this matter is now ripe for final determination.

### Brief Factual Background and Procedural History

As noted, this case has been the subject of several prior opinions adjudicating in part Petitioner's application for habeas corpus relief from his conviction and death sentence.  In each, we provided an extensive recitation of the facts which we see no need to repeat here.  Suffice it to say that on the night of September 14, 1984, Petitioner walked up to the porch of a home on West Wyoming Avenue in the Logan section of North Philadelphia on which a group of seven teenagers was sitting and emptied the

.32 caliber revolver which he was carrying at the porch, killing two of them.  Although Petitioner immediately fled the scene, he was known to almost all of the group as "Dobe," a resident of the neighborhood and they so informed the police, who quickly determined his identity and address.

Petitioner managed to evade arrest for several weeks but was apprehended on October 2, 1984 and eventually tried and convicted of two counts of first degree murder and one count of possession of an instrument of crime in April, 1987 and sentenced to death. Following his escape from custody in June, 1987, Petitioner fled to Canada.  Once there, he committed several robberies for which he was subsequently convicted in July, 1988 and served ten years' imprisonment in the Canadian system.  Although Petitioner fought deportation, his efforts proved unsuccessful and he was returned to the United States and to Pennsylvania in August, 1998.  After pursuing appellate and collateral relief in the Pennsylvania state courts, Petitioner filed the within Petition for Writ of Habeas Corpus in this court which, as discussed above, has been partially granted and the writ granted in several respects with regard to the sentence of death only.  We write now solely for the purpose of addressing Petitioner's one remaining claim raised under <u>Batson</u>.

## **Discussion**

Under the Supreme Court's holding in <u>Batson</u>, it is an equal

protection violation for a prosecutor to challenge potential jurors solely on account of their race. Batson, 476 U.S. at 89, 106 S. Ct. at 1719. This holding was extended to prohibit the exercise of peremptory challenges on the basis of ethnicity and gender in J.E.B. v. Alabama, 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994). A Batson challenge presents a mixed question of law and fact on federal habeas review. Williams v. Beard, 637 F. 3d 195, 213 (3d Cir. 2011)(citing Hardcastle v. Horn, 368 F. 3d 246, 254 (3d Cir. 2004) and Holloway v. Horn, 355 F. 3d 707, 719 (3d Cir. 2004)). When AEDPA deference does not apply, a mixed question of law and fact is reviewed *de novo*. Id.

Overcoming the presumptive validity of a peremptory strike is a three-step process. U.S. v. Smith, No. 12-2553, 529 Fed. Appx. 241, 243, 2013 U.S. App. LEXIS 12542 at *4 (3d Cir. June 20, 2013). First, a defendant must make a *prima facie* showing that a peremptory challenge has been exercised on the basis of race. Lark v. Secretary, Pennsylvania Department of Corrections, 645 F. 3d 596, 606 (3d Cir. 2011). Second, if that showing has been made, the burden shifts to the prosecution to present a race-neutral basis for striking the juror in question. Saunders v. Tennis, No. 11-2743, 483 Fed. Appx. 738, 743, 2012 U.S. App. LEXIS 10783 at *12 (3d Cir. May 29, 2012); Lark, supra. Although the prosecutor must present a comprehensible reason, "the second step of this process does not demand an explanation that is

4

persuasive, or even plausible," so long as the reason is not inherently discriminatory, it suffices. Saunders, id,(quoting, *inter alia*, Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006). And third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination. Lark, supra. (citing Miller-El v. Cockrell, 537 U.S. 322, 328-329, 123 S. Ct. 1029, 1035, 154 L. Ed.2d 931 (2003)).

At the first step, a court considers, among other factors, "how many members of the cognizable racial group are in the venire panel," and whether there is a "pattern of peremptory strikes" against those members. Smith, supra, (citing Lark, 645 F. 3d at 620). In step two, a court examines whether the government's rationale is "facially race-neutral," regardless of whether it is "persuasive, or even plausible." Id. (quoting United States v. DeJesus, 347 F. 3d 500, 506 (3d Cir. 2003)). At the third and final step, the court must determine whether the defendant has carried his burden of proving purposeful discrimination by, *inter alia*, evaluating "the persuasiveness of the justification" proffered by the prosecutor. Rice, 546 U.S. at 338, 126 S. Ct. at 974 (quoting Purkett v. Elem, 514 U.S. 765, 768, 115 S. Ct. 1769, 131 L. Ed.2d 834 (1995)). "At this step, the trial court must 'make a finding regarding the prosecutor's motivations,' 'addressing and evaluating all evidence introduced

by each side (including all evidence introduced at the first and second steps) that tends to show that race was or was not the real reason' behind the challenged strikes." <u>Saunders v. Tennis</u>, Civ. A. No. 09-1916, 2011 U.S. Dist. LEXIS 57328 at *42-*43 (E.D. Pa. May 26, 2011)(internal citations omitted and quoting, *inter alia*, <u>Bond v. Beard</u>, 539 F. 3d 256, 264 (3d Cir. 2008), <u>Wilson v. Beard</u>, 426 F. 3d 653, 670 (3d Cir. 2005) and <u>Hardcastle v. Horn</u>, 368 F. 3d at 259).

As discussed in our Memorandum Opinion of November 28, 2012, we found that of those members of the venire whose racial identities and gender could be ascertained, the Commonwealth exercised its peremptories to strike a total of 10 women, 3 of whom were African-American and 2 African-American men which correlated to a 35.7% strike rate for African-Americans in general, a 71.4% strike rate for women in general, an exclusion rate of 35.7% against African-Americans in general, and a 38% exclusion rate for women in general.[1] While there were several examples of alleged disparities in the prosecutor's voir dire questioning of several different members of the venire, upon

---

[1] The parties have since supplied additional evidence via affidavits from the jurors and/or potential jurors themselves and/or their family members, voter registration and/or death records establishing the race and/or ethnicity of sixteen additional panelists. Specifically, we now have evidence establishing that: Lisa Marie Corbett, Edward English, Rosita DeCarlo, Harry Diggs, Jr., Cherylann Lowry, Portia Maxwell, Lorene Mixson and Janice Snyder are/were African-American and that Joseph Dougherty, Vincent Galelli, Sophia Graubard, John Kephart, Kenneth Kessler, Kathryn Oleszcyk, Michael Symbula and Richard Trask are/were white.

close examination of the voir dire transcripts in their entirety,
we found no evidence of disparate treatment on the part of the
Commonwealth.  However, being mindful of the precedent holding
that striking even a single juror for a race-based reason may
give rise to a *prima face* case under Batson, and being unable to
determine any reasons from the transcripts for peremptorily
challenging at least two African-American men and two African-
American women, we determined that the taking of supplemental
evidence was advisable and accordingly we heard testimony from
Petitioner's trial attorney and the prosecutor on the dates
mentioned above.  Specifically, we had concerns as to the
reasoning behind the prosecutor's decision to strike Cherylann
Lowry, Celia Floyd, Lisa Corbett, Nathan Lewis, Edna Slater,
Lorene Mixson and Claud Johnson, there being objective evidence
that four of these possible jurors – Celia Floyd, Edna Slater,
Nathan Lewis and Claud Johnson were African-American.  At
Petitioner's request, we agreed to also consider evidence
concerning the Commonwealth's reasoning for striking one
additional juror - Sophia Graubard, who we now know is a white
female.  Consequently, the evidentiary hearings focused on the
ethnicities of these members of the venire and the Commonwealth's
rationale for excluding them from Petitioner's jury.  And,
underscoring these evidentiary proceedings is the necessity for
determining whether, in failing to object to Prosecutor Long's

7

peremptory strikes of these potential jurors, the outcome of the
proceedings would have been different such that Petitioner was
prejudiced by his attorney's alleged ineffective assistance of
counsel.

*Cherylann Lowry*

Petitioner has now submitted an Affidavit dated March 21,
2013 attesting that Cherylann Lowry, whose name is now Cherylann
McWhite is African-American.  According to the transcript from
voir dire, at the time of Mr. Judge's trial, Mrs. Lowry did not
respond to any of the general questions asked of the entire
panel,[2] indicated that she could follow the judge's instructions

---

[2] Specifically, Judge Sabo asked the following questions of the entire
panel:

(1) "Has anyone been unable to understand everything that I have said so
far?" (2) "Do any of you have any physical or mental disability which would
prevent you from hearing and concentrating upon the testimony of the
witnesses, the addresses of counsel and the instructions of the Court?" (3)
"Have any of you, or any member of your immediate family, very close relatives
or very close friends, ever been the victim of a crime of violence?" (4)
"Have any of you, or any member of your immediate family, very close relatives
or very close friends, ever been charged with a crime? And I am not talking
about traffic tickets." (5) "Whether you would follow these instructions of
the Court" [regarding unanimity of jury verdict, duty to consult with one
another and not surrendering honest conviction as to the weight or effect of
the evidence or guilt or innocence of Defendant solely because of opinion of
fellow jurors or for mere purpose of returning a unanimous verdict]? (6) "Are
any of you personally employed as a policeman, detective, or law enforcement
agent, or have any of you ever been so employed at any time during your life,
or are any of you very closely related to or very closely associated with any
policeman, investigating or law enforcement agent?" (7) "Would you
automatically consider the testimony of a policeman or other law enforcement
official more worthy of belief merely or solely because of his occupation as a
policeman or law enforcement officer and for no other reason?" (8) Would you
automatically consider the testimony of a policeman or other law enforcement
official less worthy of belief merely or solely because of his occupation as a
policeman or law enforcement officer and for no other reason?" (9) Would any
member of the panel suffer any personal serious hardship in sitting on this
jury?" (10) "Do any of you have any fixed opinion about upon (sic) the guilt
or innocence of this Defendant, or do any of you know any reason why if you
are selected as a juror in this case you cannot give this Defendant or the

8

that a defendant is innocent until proven guilty and that just because Defendant was arrested does not mean that he is guilty, that she would not hold anything against Defendant should he elect not to testify and that she could impose either a sentence of life imprisonment or death if such sentences were appropriate given the court's instructions.  She had no moral, religious or personal reservations that might prevent her from considering the death penalty in a proper case.  Mrs. Lowry testified that she lived in North Philadelphia near the intersection of Broad and Master, had graduated from Little Flower High School in 1974, was married with one 10-year-old son who attended parochial school in Philadelphia, was employed as a service operator for AT & T and that her husband was unemployed.  (N.T. 4/2/87, 56-60).  Although she was an acceptable juror to the defense, the prosecutor exercised his first peremptory strike to remove her from the jury.

Prosecutor Long could not definitively recall or state why he struck Mrs. Lowry from the jury but believed that there may have been something in her body language, tone of voice or other mannerisms which caused him to have concerns about her receptiveness to him.  (Evid. Hrg., 10/15/13, 32-35, 89-91).  Mr. Long denied that he removed her from the jury because of either her race or her gender, and Petitioner's attorney Mr. Priluker

Commonwealth a fair and impartial trial?"  (N.T. 4/2/87, 15-21).

9

likewise testified that while he cannot remember and cannot discern any reason why Mrs. Lowry would not have been a fair and impartial juror, he surmises that Mr. Long may have peremptorily challenged Mrs. Lowry because he saw something in her demeanor. (Evid. Hr. 6/20/13, 28-33; N.T. 10/15/13, 35-36).  Mr. Priluker did not object to the strike because he didn't believe that it was based on either her race or her gender. (Evid. Hrg. 6/20/13, 33-34).

*Celia Floyd*

As noted in our November, 2012 Memorandum, objective record evidence previously established that Celia Floyd is African-American.  During voir dire, Mrs. Floyd stated that she resided in the Logan section of the city near the intersection of Old York Road and Rockland, which she estimated was approximately seven blocks from 11th and Wyoming, the scene of the murders for which Roger Judge was being tried.  (N.T. 4/2/87, 60-61).  By virtue of her address, she testified that she did pass through the area of the crime scene, though she did not frequent it.  She did not recognize any of the names of the people that the prosecutor read out, did not recognize anyone in the courtroom and did not feel that it would be difficult for her to be a juror in a case involving a crime that occurred within some seven or so blocks of her home.  (N.T. 4/2/87, 61).  Mrs. Floyd testified that she had lived in Logan for the preceding five years, had

previously lived in the Tioga section of Philadelphia, had grown up and graduated from high school in North Carolina and had moved up north when she was 28.  Mrs. Floyd was married with no children, she worked as a general laborer at Mrs. Paul's Kitchens and her husband was a school bus driver for Laidlaw.  She also had no moral, religious or personal reservations that might prevent her from considering the death penalty in an appropriate case or imposing life imprisonment, would have no problem following the judge's instructions regarding the presumption of innocence and that the mere fact of his arrest did not necessarily mean Defendant was guilty, would give equal weight to the testimony of a police officer and that of a civilian, and would not hold anything against Defendant if he decided to not testify or put on a defense.  (N.T. 4/2/87, 62-64).  Mrs. Floyd was Mr. Long's second peremptory strike.  (N.T. 4/2/87, 64; Exhibit R-4).

According to Mr. Long, he had a "general aversion" ... to "selecting jurors who lived in the neighborhood where the crime occurred," and this is why he struck her.  (Evid. Hrg., 10/15/13, 41-42).  In addition, Mr. Long remembered that the defendant also lived fairly close to the murder scene and thus would have also lived "certainly close enough" to Mrs. Floyd[3] to make him

---

[3]  Indeed, it appears from the copy of the Google map of the area provided by the Commonwealth, that Ms. Floyd lived "around the corner" about 1 block away from Mr. Judge.  (Evid. Hrg. 10/15/13, 45; Exhibits R1, R2).

"uncomfortable with the venire woman."  This was the reason for his exercise of a peremptory to remove her - he did not strike Celia Floyd because she was African-American or because of her gender.  (Evid. Hrg. 10/15/15, 44-46; 3/4/14, 7-14).  Although Mr. Priluker did not have a strategic reason at the time for not objecting to the prosecution's peremptory strike of Mrs. Floyd, he agrees that striking her because of the proximity of her residence to both the defendant's home and the crime scene would have been reasonable.  (Evid. Hrg. 6/20/13, 42-43, 82-85).

*Lisa Corbett*

Through an Affidavit dated March 23, 2013, there is now objective evidence on the record that Lisa Marie Corbett, whose legal name is now Lisa Madison, is also African-American.  Over the course of individual voir dire, Mrs. Corbett indicated that she lived with her sister in the Mount Airy section of the city, that she was the mother of a two-year-old and a five-year-old, that she was employed as a claims service representative for Prudential Insurance Company and that she had gone to high school in Overbrook.  (N.T. 4/2/87, 85-86).  Mrs. Corbett also indicated that she would be able to follow the judge's instructions and afford Defendant the presumption of innocence, would not hold his decision to not testify or present a defense against him and wouldn't consider the fact that he was arrested to be evidence that he was necessarily guilty of a crime.  (N.T. 4/2/87, 83-84).

12

She further stated she wouldn't believe the testimony of a police officer over the testimony of a civilian simply because he was a police officer and that she would be able to consider a sentence of life imprisonment equally with the death penalty based on the factors outlined in the judge's instructions.  (N.T. 4/2/87, 84-85).

In answer to the questions concerning the location of the nearest intersection to her home, Mrs. Corbett first answered "Nicetown" and then stated that her home was nearest to the intersection of Germantown and Chelten Avenues.  (N.T. 4/2/87, 85; Evid. Hrg. 10/15/13, 49).  According to Mr. Long, that intersection is located neither in Nicetown nor Mt. Airy but is rather in the Germantown section of Philadelphia.  (Evid. Hrg. 10/15/13, 50).  Shortly thereafter, in response to the question inquiring into her ability to choose between the sentences of life imprisonment and death, Mrs. Corbett hesitated a moment before responding that she could choose either sentence and that she did not have a moral, religious or personal reservation about imposing the death penalty in a case where it would be proper. (N.T. 4/2/87, 84-86; Evid. Hrg. 10/15/13, 50-51, 95-100).

Mr. Long testified that it was because of the way that Mrs. Corbett answered the questions about the death penalty and the location of her home that he exercised a peremptory challenge to remove her – not because of her race or gender.  (Evid. Hrg.

13

10/15/13, 52-53; 3/4/14, 15-16).  Mr. Priluker stated that he did
not object to Mr. Long's peremptory strike, that he did not have
a strategic reason for not doing so, and that had he believed the
strike was used solely to remove Mrs. Corbett because of her race
or gender, he would have objected, but he had not noticed any
pattern of discrimination emerging.  (Evid. Hrg. 6/20/13, 45-47).

   *Nathan Lewis*

   The record in this matter having previously established that
Nathan Lewis is also African-American, we note that he had
responded affirmatively to the judge's general question about
having a family member or friend who was a member of a law
enforcement agency.  Upon further questioning during individual
voir dire, Mr. Lewis stated that he had a friend who he knew
through his membership in the Masons and the Shriners who
"belongs to the police agency."  Mr. Lewis lived in North
Philadelphia near the intersection of Columbia Avenue and Broad
Street and was brought up in North Carolina.  He was employed as
a special education teacher and football coach at Camden High
School, his wife was employed as a hospital social worker and he
had four children - three boys and one girl, between the ages of
17 and 30.  (N.T. 4/3/87, 51-53).  Mr. Lewis felt that he would
not be prejudiced against the defendant because he had a child
who would have been the same age as one of the victims, that he
could follow the judge's instructions with respect to the

presumption of innocence and that the Defendant's arrest did not
necessarily mean he was guilty of the crime charged and that he
would not negatively regard the defendant if he chose to not
testify or put on a defense.  He also felt that he would be able
to equally weigh the factors leading to either a sentence of life
imprisonment or death.  (N.T. 4/3/87, 53-54).

Mr. Lewis then went on to inform the court that he had been
previously employed and retired from the Department of Justice,
had worked for the State Bureau of Corrections for 14 years and
also was a federal investigator for the United States Civil
Service Commission.  In his position with the Bureau of
Corrections and Department of Justice, he had been an
administrative officer who dealt with behavior hearings involving
institutionalized inmates and he was in charge of an educational
program inside the institution for which he wrote proposals for
education and rehabilitation of inmates.  Mr. Lewis then further
volunteered that he had a strong belief in education
rehabilitation for penal systems and offered to explain the
principles on which he had written a synopsis about the death
penalty, although he maintained that his beliefs were not so
strong that it would interfere with a decision for a death
penalty in this case.  (N.T. 4/3/97, 56-60).

Mr. Long stated that he didn't strike Mr. Lewis because of
his race, but rather because of his history in working with

15

inmates' behavior hearings, his stated belief that education and rehabilitation were the route to be taken with prisoners and his offer to discuss his principles about the death penalty.  (Evid. Hrg. 10/15/13, 60-65; 3/4/14, 17-18).  Mr. Long further noted that he "certainly would not have been crazy that his wife was a social worker, either."  (Evid. Hrg. 3/4/14, 17).

For his part, Mr. Priluker found Mr. Lewis to be an acceptable juror though he raised no objection to the Commonwealth's exercise of a peremptory strike to remove him. (Evid. Hrg. 6/20/13, 54-55).  Mr. Priluker was not keeping track of the make-up of the panel at the time that Mr. Lewis was interviewed so he doesn't know how many African-Americans had been stricken from the jury through the prosecutor's exercise of peremptory challenges.  (Evid. Hrg. 6/20/13, 56-58). Nevertheless, given Mr. Lewis' employment history and his strong beliefs in education and rehabilitation of prisoners, Mr. Priluker perceived that these were the reasons for Mr. Long's strike – not Mr. Lewis' race.

*Edna Slater*

Again, as we noted in our November, 2012 opinion, the record in this case includes objective evidence that Edna Slater is an African-American woman.  Ms. Slater stated that she had lived in the West Tioga section of Philadelphia near the intersection of Broad and Chelten Avenues since December, 1958, and that she had

retired two years previously from her position as a sixth grade teacher with the Philadelphia Public School system.  (N.T. 4/3/87, 91).  Ms. Slater had no children, she had been born in Alabama but moved north when she was seven or eight years old, she didn't really have a fixed opinion against the death penalty, would be able to keep an open mind and listen to all the facts and then weigh the factors outlined by the judge fairly and objectively and if she felt it appropriate decide on either sentence.  (N.T. 4/3/87, 92-94).  Ms. Slater further said that she could follow the judge's instructions that every individual accused of a crime is presumed innocent unless the prosecution proves them guilty beyond a reasonable doubt and she would not hold it against the defendant if he elected to neither testify nor put on any witnesses; she also thought she would be able to hear the case fairly and objectively despite the fact that one of the victims was a 15-year-old girl and she had been a school teacher.  (N.T. 4/3/87, 92-93).

In reviewing the Notes of Testimony from the voir dire, Mr. Long testified that he struck Ms. Slater because he was concerned about the answers she gave in response to the colloquy on the death penalty.  Specifically, Ms. Slater's response to the question "Do you have any religious or personal reservations that might prevent you from considering the death penalty in a proper case?" was: "Well, it all depends."  When Mr. Long inquired "on

what?," Ms. Slater replied: "Like you said, religious... Well, no,

not really."  (N.T. 4/3/87, 89; Evid. Hrg., 10/15/13, 67-68).

Mr. Long stated that these responses:

> "caused [him] some concern that maybe she did have some
> reservations on religious grounds.  Then, if you look over on
> the next page, at Page 90, I note that at least in my opinion
> she was smiling as we were having this colloquy and there was
> something obviously about that non-verbal communication or
> that non-verbal body language that also concerned me."
> (Evid. Hrg. 68).

It was because of these concerns that Mr. Long exercised a

peremptory to remove Ms. Slater – not because of her race or her

gender.[4]  (Evid. Hrg., 68).  Mr. Priluker stated that he did not

---

[4]  We note that Ms. Slater further testified in answer to the inquiry
into whether she had any personal, moral, ethical or anything that she might
know about that might prevent her from considering the death penalty as
follows:

> "Well, it's kind of hard to say yes and hard to say no, because there
> can be some reasons where - some reasons why I will say yes and some
> reasons why I would say no.  It all depends."

Q.   That is the question.  As you sit here today you are not opposed to the
death penalty?  Is that correct or is it not correct?

A.   May I hear your question again?

Q.   Sure.  As you sit here today, do you have a fixed opinion against the
death penalty?

A.   Not really.  It all depends on what the case is.

Q.   Okay, that's really the question.  Would you be willing to keep an open
mind and listen to this case, listen to all the facts, and then, if it
were appropriate, consider the death penalty at the end of the case?

A.   Yes.

Q.   You are smiling I'm not sure if that is indicating...

A.   No, that's not smiling.

Q.   Pardon me.

A.   That's just one of my ways of saying yes.  I mean I smile anyway,
sometimes.

object to the striking of Ms. Slater – he saw no evidence that she was stricken because of her race or her gender, but believed it was because she had expressed hesitation about the death penalty. Mr. Priluker further observed that if he were on Mr. Long's "side," he too would have exercised a peremptory challenge on Ms. Slater. (Evid. Hrg., 6/20/13, 59-61).

*Lorene Mixson*

Since we issued our November, 2012 Memorandum Opinion, the parties have supplied an affidavit attesting to the fact that Lorene Mixson is African-American.  Mrs. Mixson did not respond to any of Judge Sabo's general questions addressed to the panel and on individual voir dire stated that she was from South Philadelphia, a graduate of South Philadelphia High School, and resided near Oregon Avenue's intersection between 6th and 7th Streets.  (N.T. 4/6/87, 68-69).  She was employed as a hospital technician, her husband worked for the Department of Traffic Engineering preparing street signals and street lights, they had one 14-year-old daughter who did not attend school in the city. Mrs. Mixson testified that she had no moral, religious or personal reservations that might prevent her from considering the death

---

Q.    We are not suggesting that it wouldn't be difficult, Miss Slater.

A.    It would be.

Q.    But it would not be impossible, is that correct?

A.    No, it would be impossible - no, it wouldn't be impossible.

(N.T. 4/3/87, 89-90).

penalty, she could choose between a sentence of life imprisonment and death if it came to it, she could adhere to the judge's instructions that the defendant was to be presumed innocent until proven guilty beyond a reasonable doubt and would not hold it against the defendant if he were to elect to not testify or present a defense.  Mrs. Mixson also affirmed that she wouldn't accord the testimony of a police officer any more or less weight merely because he was an officer and that she would not be prevented from being fair to the defendant because one of the victims was approximately the same age as her daughter.  (N.T. 4/6/87, 70-73).  Despite these responses, Mr. Long exercised a peremptory challenge to strike her from the jury.  (N.T. 4/6/87, 73).

When asked to explain the reasoning behind his peremptory challenge, Mr. Long candidly stated that he did not know and could not remember why he struck Lorene Mixson although he denied that it was because of her gender or her race.  (Evid. Hrg. 10/15/13, 71-72).  As a consequence, Mr. Long believes that he must have stricken Mrs. Mixson on the basis of some non-verbal exchange or communication.  (N.T. 4/6/87, 71, 73; Evid. Hrg. 10/15/13, 72-74, 91-92; 3/4/13, 20-21).

Mr. Priluker acknowledged that he did not object to Mr. Long's exercise of a peremptory strike to remove Mrs. Mixson because he had not observed any pattern of discrimination on race

or sex grounds and he did not want to annoy the judge by making
"knee-jerk objections."  Although he could not discern from his
notes whether Mr. Long had a race-neutral reason for striking Mrs.
Mixson as a juror, Mr. Priluker reiterated that if he had observed
a discriminatory pattern, he would have objected.  (Evid. Hrg.
6/20/13, 36-39, 96-97).

    *Claud Johnson*

    Claud Johnson, the record previously reflected, is African-
American.  He responded to Judge Sabo's inquiry into whether he or
a close family member or friend was a member of a law enforcement
agency and explained on individual voir dire that he was employed
as a security officer in the forensic unit at the Philadelphia
State Hospital at Byberry.  (N.T. 4/6/87, 200).  His employment
notwithstanding, Mr. Johnson did not believe that he would tend to
believe the testimony of a police officer or security officer
merely because he was an officer and thought that he would be able
to give equal weight to testimony given by either a civilian or a
law enforcement official.  (N.T. 4/6/87, 200-201).  Mr. Johnson
was divorced, had two children ages 18 and 21 and resided in
Southwest Philadelphia near 50th and Woodland.  (N.T. 4/6/87, 201).
He stated that he would not be prejudiced against the defendant
because the victims, had they lived, would be the same ages as Mr.
Johnson's children and that he could follow instructions regarding
the presumption of innocence and would not hold it against the

21

defense if it decided to not present any witnesses at all, including the defendant himself.  (N.T. 4/6/87, 202).  Finally, Mr. Johnson testified that he had no fixed opinions against capital punishment and could keep an open mind and choose between a sentence of life imprisonment and the death penalty, and he did not believe that the defendant was guilty merely because he had been arrested and charged with the crime of murder.  (N.T. 4/6/87, 203).  Although he was acceptable to the defense, Mr. Long exercised a peremptory challenge.  (N.T. 4/6/87, 204).

In explanation, Mr. Long stated unequivocally that the reason he struck Mr. Johnson from the jury was because he was a security guard – not because of his race or gender. (Evid. Hrg. 10/15/13, 75, 101-102).  Mr. Long noted that Mr. Johnson did not just consider himself to be a security guard, but he considered himself to be a member of law enforcement which gave rise to fears on Mr. Long's part that Mr. Johnson considered himself to be larger than he was and would attempt to exert more influence on the jury because he was entitled to.  (Evid. Hrg., 10/15/13, 103-104; Evid. Hrg., 3/4/14, 21-23).  Although Mr. Priluker did not object to Mr. Long's exercise of a peremptory strike to remove Mr. Johnson and did not know why he elected to strike him, he did not perceive it to be on racial grounds and he agreed that striking someone because he worked as a security officer or guard with incarcerated psychiatric inmates was a valid and race-neutral reason for using

a peremptory challenge.  (Evid. Hrg. 6/20/13, 47-52, 98).

   *Sophia Graubard*

   The record now reflects that Sophia Graubard is a Caucasian woman.  (Affidavit of Investigator Pamela Tucker, dated 4/16/13).  Although she did not respond to any of the judge's general questions of the panel, she indicated during individual voir dire that her estranged husband had been a uniformed police officer for two years while they were together.  (N.T. 4/2/87, 119-120).  She stated that despite this, she would not tend to believe a police officer's testimony over that of an ordinary citizen merely because he was a police officer.  At the time of voir dire, Mrs. Graubard lived in the Northeast near the intersection of Cottman and Torresdale Avenues but had previously lived in Port Richmond.  She was raised in Ohio but had lived in Philadelphia for some 20 years.  She had two jobs – one as a receptionist and typist in an office and the other working in a deli, and was the mother of an 8-year-old daughter who attended parochial school in the city.  (N.T. 4/2/87, 120-122).  Mrs. Graubard felt that she could afford the defendant the presumption of innocence, would not view Defendant negatively if he chose to not testify or present a defense, had no moral, personal or religious reservations that might prevent her from considering the death penalty and believed that she could weigh both the potential sentences of the death penalty and life imprisonment equally.  Mrs. Graubard also said

23

that she was "a very fair person and a very respectful person,"
who would not be prejudiced by the fact that the case involved the
shooting death of a 15-year-old girl despite her having an 8-year-
old daughter.  (N.T. 4/2/87, 122-124).  At the conclusion of her
individual voir dire, Mr. Long peremptorily challenged her.  (N.T.
4/2/87, 124).

     According to Mr. Long's testimony at the evidentiary hearing
held in this matter on October 15, 2013, he did not strike Mrs.
Graubard because of her race or gender but because he was
concerned that she would have antipathy or hostility in general
against police officers and the credibility of police officers
because of her relationship to the husband from whom she was then-
separated.  (Evid. Hrg. 10/15/13, 55, 57, 58).  Mr. Long further
was uncomfortable with the fact that she did not respond initially
to the judge's questions on this point and then later sought to
ask a question and offer information and went on to make a speech
about how fair she was.  (N.T. 10/15/13, 56-57).

     Mr. Priluker testified that he did not object to the
Commonwealth's peremptory strike of Mrs. Graubard because he did
not perceive it to be based on her gender, though he admitted that
throughout the jury selection process he had not been keeping
track of who Mr. Long had been exercising his peremptories on or
on the racial and gender make-up of the panel.  Instead, Mr.
Priluker looked generally to whether he saw a pattern of

24

discrimination emerging and, in this case, he saw no such pattern. (Evid. Hrg. 6/20/13, 63-66, 99).  While it was Mr. Priluker's opinion that having an ex-husband who had been a police officer could be either favorable or unfavorable to the prosecution depending upon the nature of the relationship, he agreed that having a former husband who had been a policeman was a valid, race-neutral reason for utilizing a peremptory challenge.  (Evid. Hrg., 99-100).

We have now been provided with objective evidence of the racial composition of 40 of the 87 members of Mr. Judge's venire: 12 Caucasian men, 6 African-American men, 10 Caucasian women and 12 African-American women.  Of the total of 14 peremptory challenges exercised by the Commonwealth, we now know that 9 of those challenges were employed against African-Americans - 7 of whom were women and 2 of whom were men; 2 were used to remove Caucasian men and 3 were used to strike Caucasian women.  This correlates to a strike rate against African-Americans in general of 64.3%, a 71.4% strike rate against women in general, an exclusion rate of 50% against African-Americans in general and an exclusion rate of 45.4% against women in general.[5]  Regardless, Petitioner's jury was ultimately composed of 6 Caucasian men, 2 African-American men, 2 Caucasian women and 2 African-American

---

[5]   As we previously observed in our prior opinions, it remains possible that the strike and exclusion rates outlined above may well be different in light of our limited knowledge regarding the racial identity of some 47 members of the venire.

women.

While we did not directly find that Petitioner had made the requisite *prima facie* showing that Mr. Long exercised his peremptory challenges in an unlawfully discriminatory manner, after considering the potential jurors' voir dire statements, the prosecutor's questions and statements during voir dire and the number of members of the cognizable groups which were in the venire panel, we concluded that the record raised sufficient questions to require an explanation from the Commonwealth. Thus, giving Defendant the benefit of all possible doubt, we shall accept for the sake of argument that he made out a *prima face* case of unlawful discrimination. However, Mr. Long has now articulated valid, race-neutral reasons behind the exercise of his peremptory challenges and, after now hearing him out and considering such other relevant factors as whether there was a pattern of strikes against particular jurors, the nature of the crime and the races of the defendant and the victims, we cannot find that Petitioner has met his burden of establishing purposeful discrimination.

For one, the prosecutor gave plausible, rational reasons which were supported by the notes of testimony as to why he chose to remove Celia Floyd, Lisa Corbett, Nathan Lewis, Edna Slater, Claud Johnson and Sophia Graubard from the jury. Defense counsel agreed that the reasons given were indeed reasonable and race/gender neutral and we concur. Although by his own admission,

Mr. Long did not recall and could not definitively state why he peremptorily challenged Cherylann Lowry and Lorene Mixson, he believed that he likely saw something in their demeanor or in their body language that suggested some hostility toward him or caused him to perceive that they would not be receptive to either him or his client.   We find Mr. Long's testimony to be credible and this explanation believable, particularly in light of the nearly 27 years that have elapsed since the trial.

Second, Mr. Priluker testified that he had not noticed a pattern emerging from Mr. Long's use of peremptory challenges such as would be suggestive of discriminatory intent and that if he had observed such a pattern, he would have objected.   We likewise find Mr. Priluker's testimony to have been forthright and credible given that our review of the voir dire transcripts failed to uncover a pattern of unlawful strikes either.   While Defendant asserts that, at least in comparison to Celia Floyd, the Commonwealth did not ask of two other individuals who lived near the crime scene, both of whom were subsequently empaneled as jurors and one of whom actually lived closer to the scene than did Ms. Floyd,[6] whether they frequented the area of 11th and Wyoming, we find that there was a race-neutral explanation for this

---

[6]   Floretta Brown, an African-American woman, who was originally selected as Juror No. 4, lived approximately two blocks from the crime scene. Mrs. Brown was subsequently excused from service because she was fearful for the safety of her children should she be required to serve.   (N.T. 4/8/87, 4; Evid. Hrg. Exhibit R-5).

disparity as well.  (Evid. Hrg. 3/4/14, 10-14).   On this point,
Mr. Long testified that although he couldn't specifically say
given the passage of time precisely why he accepted Ms. Brown, he
thought that there was something else in the responses which she
gave to his and Mr. Priluker's questions which outweighed the fact
that she lived close to the scene of the crime.  (Evid. Hrg.
3/4/14, 14).  And as to Mr. Galelli, his residence was much
further from the scene of the crime – some 12 to 13 blocks away,
which is why Mr. Long did not make any inquiry into his
familiarity with the area surrounding 11th Street and Wyoming
Avenue.  (Evid. Hrg. 3/4/14, 9-12).  Again, we find Mr. Long's
explanation as to why he questioned and treated these jurors
differently to be plausible and credible, as we also find his
testimony that he weighed the pros and cons of each individual
juror's characteristics and thus did not always strike jurors for
the exact same reasons to be rational.  (Evid. Hrg. 10/15/13, 11-
12; 3/4/14, 3-5).

Third, as we have already observed, we found both Mr. Long
and Mr. Priliker to have testified credibly.  Thus, we accept Mr.
Long's denial that he exercised any of his peremptory challenges
in this case for reasons of that individual's race and/or gender.
We likewise accept Mr. Priluker's statements that he saw no
discriminatory pattern emerging from Mr. Long's exercise of his
peremptories or any other evidence of race or gender-based animus

and that if he had seen any evidence of discrimination or a pattern of discrimination, he would have raised an objection to Judge Sabo.

Finally, we find no basis to disregard as untrue Mr. Long's testimony that he did not learn of the infamous Jack McMahon lecture and videotape regarding jury selection until after he had left the District Attorney's office. (Evid. Hrg. 10/15/13, 13-14). Although he had read a copy of the transcript from the videotape in preparation for the evidentiary hearings in this case, he has yet to see the videotape and is not of the opinion that the tape represents an embodiment of the DA's office's policy and procedures as to jury selection; it is rather just a reflection of Mr. McMahon's own approach to jury selection. (Evid. Hrg., 10/15/13, 12).

We therefore find no evidence that the reasons articulated by the prosecuting attorney are a pretext for what would otherwise be the discriminatory exercise of his peremptory challenges. In the absence of such a finding, it is clear that Petitioner is not entitled to relief from his conviction on the basis of Batson v. Kentucky and/or J.E.B. v. Alabama, both supra, or that he was rendered ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) by virtue of Mr. Priluker's failure to timely object to Mr. Long's strikes on the basis of Batson. We therefore also deny

Petitioner's claim that his constitutional rights were violated during the process of jury selection.

An Order follows.